Luis A. ACEVEDO GARCIA,
et al., Plaintiff,

v.

Hon. Roberto VERA MONROIG,
et al., Defendant.

No. Civ. 97–2639 (JP).

United States District Court,
D. Puerto Rico.

Nov. 23, 1998.

Israel Roldan–Gonzalez, Aguadilla, PR, Miguel A. Pagan–Rivera, Hato Rey, PR, for plaintiffs.

Judith Martinez–Fortier, Department of Justice of PR, Federal Litigation Division, San Juan, PR, Johanna Emmanuelli–Huertas, Ponce, PR, for defendants.

## OPINION AND ORDER

PIERAS District Judge.

### I. Introduction and Background

The Court has before it Defendants' Motion for Summary Judgment (**docket No. 53**), Plaintiffs' Motion Opposing Summary Judgment (docket No. 63), Defendants' Reply to Opposition to Motion for Summary Judgment (docket No. 72), and Plaintiffs' Answer to Defendants' Reply to Plaintiffs' Motion in Opposition for Summary Judgment (docket No. 74).

Plaintiffs are 88 current and former career employees of the Municipality of Adjuntas. In their Complaint, Plaintiffs allege that they were harassed and dismissed from their positions with the Municipality of Adjuntas for politically discriminatory reasons by the following Defendants: the Honorable Roberto Vera Monroig, Mayor of Adjuntas ("Mayor Vera"), Irma M. González Delgado, Personnel Director of the Municipality of Adjuntas ("González"), and the Municipality of Adjuntas ("Municipality").

Plaintiffs, members of the New Progressive Party ("NPP"), assert that after Mayor Vera, a member of the Popular Democratic Party ("PDP"), was elected in November of 1996 and assumed office on January 14, 1997, Defendants discriminated against them because of their political affiliation with the NPP. Plaintiffs' claims are based on the First, Fifth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. In addition, Plaintiffs invoke the Court's supplemental jurisdiction, stating claims under Article II, Sections 1, 2, 4, 6, 7, 16, 19, and 20 of the Constitution of the Commonwealth of Puerto Rico and 29 L.P.R.A. § 146 ("Law 100") prohibiting discrimination based on political beliefs, as well as economic loss, humiliation, mental distress, and emotional suffering pursuant to 31 L.P.R.A. §§ 5141, 5142.

In their Motion for Summary Judgment, Defendants present the following bases for their dismissal of Plaintiffs' claims: (1) Plaintiffs have failed to state a claim for political discrimination; (2) Plaintiffs' layoff was the result of a legitimate "Layoff Plan," approved pursuant to applicable statutes; (3) the Individual Defendants are entitled to absolute and/or qualified immunity for their legislative actions; (4) the Municipality cannot be held liable as it did not have the appropriate discriminatory intent and/or there is no respondeat superior liability; and (5) Plaintiffs have failed to establish a prima facie case of political harassment, and further cannot establish that the Municipality had a "public policy" of harassment.

### II. Uncontested Facts

The following facts are undisputed. (Pls.' Mot.Op.Summ.J. at 2, ¶ 7); (Defs.' Statement Uncontested Facts at ¶¶ 1–33, 35–38, 41, 42)

The PDP and Defendant Mayor Vera, president of the PDP in Adjuntas, won the

November 1996 elections in the Municipality of Adjuntas. Defendant Vera has served as Mayor of Adjuntas since January 14, 1997. Defendant González, a member of the PDP, has served as the Director of Human Resources of Adjuntas since January 14, 1997.

Rigoberto Ramos, an NPP member, is the former Mayor of Adjuntas, and held the office of Mayor from January 1973 through 1980, and from 1989 through 1996.. During the period from 1989 to the beginning of the PDP administration, the Municipality had hired 115 employees, two of which were affiliated with the PDP. In January of 1997, Adjuntas employed 229 regular employees, and many departments were so overstaffed that some employees did not have desks. Also during this time period, 25 municipal employees worked for state agencies and another 24 worked for private corporations. The salaries of these employees were paid with municipal funds.

On April 30, 1996, the Puerto Rico Comptroller's Office issued an audit report, M–96–14, indicating that the Municipality had a deficit of at least $1,000,000 per year since 1985. On January 13, 1997, Mayor Vera requested a financial situation study from a Certified Public Accountant, Reinaldo Ramírez ("C.P.A.Ramírez"), and the report was delivered on May 8, 1997. On or around February 17, 1997, Mayor Vera also contacted Guerra, Chiesa, Rivera, Inc., Management and Human Resource Consultants ("Human Resource Consultants"), and requested an evaluation of all personnel files of Municipality employees. Human Resource Consultants prepared a "Layoff Plan for Municipality of Adjuntas Employees" ("Layoff Plan") in March 1997.

The Autonomous Municipalities Act, 21 L.P.R.A. § 4551, as amended in 1995, or "Law 81," requires Municipalities to approve any layoff plan. On April 2, 1997, the Adjuntas Municipal Assembly approved and enacted the Layoff Plan for the Municipality, Ordinance No. 25 (1996–97). A copy of the plan was given to each municipal employee during the week of April 11, 1997.

In May 1997, Mayor Vera held a meeting with C.P.A. Ramírez, Human Resource Consultants, and other Municipality officials to discuss the financial report rendered by C.P.A. Ramírez. The report concluded that the Municipality had a budget deficit of over $5,000,000 and long term debts of $2,000,000. Based on this meeting and the conclusions of the financial report, Mayor Vera gave instructions to implement the Layoff Plan. Starting in May 1997 and for the following six months, Human Resource Consultants and Municipality officials evaluated each personnel file to assess the seniority of Adjuntas employees. Human Resource Consultant Luz M. Guerra held meetings with each department head to establish the minimum number of positions needed to render services.

In July 1997, a list of the positions that could be eliminated was prepared by Human Resource Consultants. On July 29, 1997, notice was sent to all career employees indicating the initial date of public service employment and the accumulated years of public service for each employee. Each employee was also notified that he or she could submit evidence of further public service if the information provided by the Municipality was incorrect.

On or about the first week of September 1997, Human Resource Consultants and Municipality officials prepared the list of employees that would be affected by the Layoff Plan. On September 11, 1997, a letter of severance was sent to 105 employees. The affected employees were also notified of their right to appeal the layoff decision to the Personnel Administration Systems Board of Appeals.

On September 12, 1997, the Municipality posted a list of all employees and their seniority. On September 30, 1997, a letter was sent to employees affected by the Layoff Plan, offering them an orientation program in coordination with the Department of Labor and Human Resources to help them search for new jobs. On October 15, 1997, lists of employees both affected and unaffected by the Layoff Plan were posted. In addition, the Municipality extended the effective date of the layoff from October 15, 1997 to October 31, 1997. Three of the 105 employees affected by the Layoff Plan were found,

upon further evaluation, to have more public service time than previously believed, and therefore, these employees were removed from the layoff list.

A second letter was sent to the affected employees on October 15, 1997, informing them of their right to appeal the layoff decision. Two of the affected employees exercised their right to appeal. A severance plan for the Municipality became effective October 31, 1997, affecting 11 PDP employees whose public service ranged from four to 29 years. On November 19, 1997, the Adjuntas Municipal Assembly eliminated the 102 positions affected by the implementation of the Layoff Plan and readjusted the budget accordingly through Ordinance No. 20 (1997–98). Defendants have hired a total of 77 employees since January 1, 1997 into Municipal positions under state funded programs as contract employees (Defs.' Ex. 26)

In addition to the undisputed facts listed above, Plaintiffs offer additional contested facts. (Pls.' Statement Contested Facts) First, Plaintiffs claim that many of the Plaintiffs have more years of service or seniority than employees that were retained by the Municipality. Second, Plaintiffs assert that Defendants discriminated against them in the implementation of the Layoff Plan, and that Defendants did not comply with Article VI of the Layoff Plan itself, indicating procedures to be followed before decreeing layoffs.

Plaintiffs also claim that after the new administration took office and before the Layoff Plan was implemented, the Municipality employed workers affiliated with the PDP to perform functions, duties, and/or tasks previously assigned to Plaintiffs. Plaintiffs allege that during this transition period, they were treated differently than PDP affiliated employees, and that their individual supervisors as well as Mayor Vera made comments to the effect that their treatment was the result of Plaintiffs' political affiliation. Finally, Plaintiffs assert that most of the laid-off employees whose positions were similar to those funded by the Municipality were not offered any jobs, and that approximately eight of the Plaintiffs are working under a proposal, while some were offered jobs for which they did not qualify.

## III. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be entered against a party where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993).

Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505; *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989) A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The moving party bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the non-moving party, who may not rest upon mere allegations or denials of the pleadings, but who must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *Goldman*, 985 F.2d at 1116 (1st Cir.1993); *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In meeting its burden, the non-moving party must produce enough evidence to show that it is entitled to a trial, not that it will necessarily be successful at trial. *Casas Office Machines, Inc. v. Mita Copystar America, Inc., et. al.*, 42 F.3d 668, 686 (1st Cir.1994) (citing *First Nat'l Bank of Arizona*, 391 U.S. at 288–89, 88 S.Ct. 1575).

## IV. Discussion

### A. Absolute Immunity for Legislative Acts

Defendants claim that individual Defendants Mayor Vera and Human Resources Coordinator González are entitled to summary judgment because they are absolutely immune from liability under the doctrine of legislative immunity. Defendants' argument centers around the recent United States Supreme Court case, *Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 973, 140 L.Ed.2d 79 (1998). Based on the holding in *Bogan*, Defendants assert that both Defendants' proposal and implementation of the legislation eliminating Plaintiffs' positions is entitled to absolute immunity.

While conceding that the passage and signing of Ordinance No. 20 (1997–98) is a legitimate act of the Adjuntas Municipal Assembly and Defendant Vera, Plaintiffs, however, assert that its implementation was an executive act which is not entitled to immunity.[1] Plaintiffs claim that the Layoff Plan was an effort by Defendants to conceal their discriminatory motives and to dismiss Plaintiffs for their affiliation with the NPP. In addition, Plaintiffs state that the individual Defendants did not follow the Ordinance, and that their acts of "intentional and willful non-compliance" are not entitled to immunity. (Pls.' Mem. Law Sup.Mot. Opp'n. Summ.J. at 24)

The United States Supreme Court has recognized that public officials, sued in their individual capacities, may be immune from § 1983 suits under certain circumstances. *See Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Absolute immunity for liability resulting from legislative activities is a firmly rooted constitutional and common law principle. *See Bogan*, 118 S.Ct. at 970 (citing U.S. Const., Art. I, § 6; *Tenney*, 341 U.S. at 372–75, 71 S.Ct. 783). The Supreme Court has held that state legislators, *see Tenney*, 341 U.S. at 377–78, 71 S.Ct. 783, and regional legislators, *see Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), are entitled to absolute immunity from liability under § 1983 for their legislative activities.

In *Bogan*, the Supreme Court held for the first time that absolute immunity applies to local legislators under § 1983. *See Bogan*, 118 S.Ct. at 971. Prior to the *Bogan* decision, a majority of circuit courts had applied legislative immunity to local legislators. *See Acevedo–Cordero v. Cordero–Santiago*, 958 F.2d 20, 23 (1st Cir.1992); *Haskell v. Washington Township*, 864 F.2d 1266, 1277 (6th Cir.1988); *Aitchison v. Raffiani*, 708 F.2d 96, 98–100 (3rd Cir.1983); *Reed v. Shorewood*, 704 F.2d 943, 952–53 (7th Cir.1983); *Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 829 (11th Cir.1982); *Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1349–50 (9th Cir.1982); *Hernandez v. Lafayette*, 643 F.2d 1188, 1193–94 (5th Cir.1981); *Bruce v. Riddle*, 631 F.2d 272, 274–80 (4th Cir.1980); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 611–14 (8th Cir.1980).

In addition to extending absolute immunity under § 1983 to local legislators, the *Bogan*

---

1. Plaintiffs initially argue that since Defendants did not allege immunity in their Answer, the defense is waived for purposes of summary judgment. Plaintiffs point the Court to their "Opposition to Qualify [sic] Immunity Defense" (docket No. 20), which they filed on March 13, 1998. The Opposition motion does not, however, argue that qualified immunity should be waived because it was not alleged in Defendant's Answer. Rather, Plaintiffs assert that the defense should be barred because it was not based on any supporting documents or evidence, or in the alternative, because of the merits of the defense. The Court notes that qualified immunity is an affirmative defense, and the "burden of pleading it rests with the defendant." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). A failure to plead immunity can constitute a waiver of the defense. *See Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664, 667 (1st Cir.1996) (quoting *Kennedy v. City of Cleveland*, 797 F.2d 297, 299 (6th Cir.1986)). The First Circuit, however, has held that a district court has discretion to permit the immunity defense, even if it was not raised prior to discovery. *See Id.* at 668. In the case at hand, the individual Defendants raised the issue of qualified immunity prior to discovery in their Initial Scheduling Conference Memorandum (docket No. 16). Plaintiffs were aware of the immunity defense early in the litigation, and therefore, the Court will not bar the defense merely because it did not appear in Defendants' Answer. The Court also notes that the issue of absolute immunity is not waived for the purposes of summary judgment, as the Court itself brought the issue to the parties' attention early on in the litigation (docket No. 24, dated March 25, 1998).

Court addressed the issue of what acts are entitled to absolute immunity. Only legislative, and not administrative, acts are entitled to absolute immunity; therefore, the Court elaborated on the distinction between the two, stating that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 118 S.Ct. at 973. The Court's analysis of the facts in *Bogan* regarding this issue is relevant to the instant case.

In *Bogan*, Respondent Scott–Harris lost her position as administrator of the Department of Health and Human Services (DHHS) based on a budget plan that was proposed and signed by Petitioner Mayor Bogan and passed by the city council.[2] The First Circuit had held that Petitioners' conduct was not legislative because their actions were specifically targeted at Respondent. In reversing the First Circuit's decision, the Court stated that:

> Although the Court of Appeals did not suggest that intent or motive can overcome an immunity defense for activities that are, in fact, legislative, the court erroneously relied on petitioners' subjective intent in resolving the logically prior question of whether their acts were legislative. *Id.* at 972–3.[3]

The Court, therefore, analyzed Petitioners' actions solely for their functions and "stripped of all considerations of intent and motive." *Bogan*, 118 S.Ct. at 973. The Court held that Petitioner Bogan's acts of introducing a budget and signing an ordinance into law were formally legislative, even though he was an executive official, because his actions were "integral steps in the legislative process." *Id.* (citing *Supreme Court of Va. v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731–34, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980)).

In the instant case, Mayor Vera and the Director of Human Resources, González, were involved in both the passage and implementation of Ordinances 25 (1996–97) and 20 (1997–98). The undisputed facts show that Mayor Vera and González worked together with Human Resource Consultants in proposing the Layoff Plan to the Municipal Assembly. (Defs.' Statement Uncontested Facts ¶¶ 11–15) On April 3, 1997, the Municipal Assembly passed the Ordinance adopting the Layoff Plan by a vote of 7 to 3. (Defs.' Ex. 6) After the adoption of Ordinance 25 (1996–97), it is undisputed that Mayor Vera and González worked to implement the legislation and Layoff Plan. (Defs.' Statement Uncontested Facts ¶¶ 17–33, 35–37) Their efforts resulted in the Municipal Assembly's passage of Ordinance 20 (1997–98) which eliminated 102 positions affected by the implementation of the Layoff Plan. (Defs.' Ex. 20)

Based on the criteria set forth in *Bogan*, the question relating to Mayor Vera and González's actions is whether, regardless of motive, their work relating to Ordinances 25 (1996–97) and 20 (1997–98) constitutes a legislative function. Mayor Vera's initial introduction of the Layoff Plan to the Municipal Assembly and signing the Ordinances into law are clearly legislative functions and shielded by absolute immunity. *See Bogan*, 118 S.Ct. at 973. Neither the *Bogan* Court nor the First Circuit, however, has addressed the issue of whether the enforcement or implementation of legislation by an executive officer constitutes a legislative function.

---

**2.** The other Petitioner, Roderick, was the vice president of the Fall River City Council.

**3.** The First Circuit has traditionally applied a two-part test to determine whether an act is legislative or administrative. Under this test:

> If the underlying facts on which the decision is based are 'legislative facts,' such as 'generalizations concerning a policy or state of affairs,' then the decision is legislative. If the facts used in the decision making are more specific, such as those that relate to particular individuals or situations, then the decision is adminis-

trative. *Cutting v. Muzzey*, 724 F.2d 259 (1st Cir.1984).

The First Circuit applied this test in the lower court opinion in *Bogan*. See, *Scott–Harris v. City of Fall River*, 134 F.3d 427, 441 (1st Cir.1997). Under this standard, the First Circuit has upheld grants of summary judgment because of controverted facts regarding the motivation behind the enactment of legislation. *See generally, id.* (citing *Acevedo–Cordero v. Cordero–Santiago*, 958 F.2d 20 (1st Cir.1992)). This basis for denying summary judgment, however, is clearly overruled by *Bogan*.

Several courts in other circuits have confronted the issue of whether legislative immunity extends to the implementation of legislation, holding that implementation is an executive act that is not entitled to legislative immunity. *See Carver v. Foerster,* 102 F.3d 96 (3rd Cir.1996) (officer did not act in legislative function when ordering employee's termination pursuant to legislation because he "would not be engaging in policy-making of general application regarding the expenditure of County funds, but would be making either an executive decision on how the anticipated cutback should be implemented or an administrative decision that certain individuals should be fired."); *Latino Political Action Committee v. City of Boston,* 581 F.Supp. 478, 482–83 (D.Mass.1984) (mayor not immune from suit to enjoin him from enforcing or implementing election district plan because not functioning in a legislative capacity); *Fralin & Waldron, Inc. v. County of Henrico,* 474 F.Supp. 1315, 1321 (E.D.Va. 1979) (executive official's actions in enforcing a change in zoning by refusing to approve plaintiff's project are not entitled to legislative immunity).[4]

 The Court finds that the individual Defendants' actions in implementing the Ordinance and Layoff Plan cannot be considered legislative acts as they involved traditional executive functions. Regardless of any alleged unconstitutional motive, the Defendants' actions that did not involve the introduction or signing of legislation were not "integral steps in the legislative process." *Id.* Mayor Vera and González went beyond merely introducing the Layoff Plan to the Municipal Assembly; they actively implemented the Layoff Plan by eliminating certain positions while retaining others, and by hiring new employees into contractual positions. Therefore, Mayor Vera and Gonzá-

lez's actions in implementing the Layoff Plan are not entitled to absolute legislative immunity.

**B. Qualified Immunity**

Defendants argue that even if Mayor Vera and González are not entitled to legislative immunity, they are shielded from liability by the doctrine of qualified immunity because their actions in implementing the Layoff Plan were objectively reasonable. Plaintiffs, on the other hand, appear to claim that none of the positions eliminated by Defendants fall within the First Circuit's definition of permissible patronage dismissals. Therefore, Plaintiffs assert that Defendants are not immune from liability since their unconstitutional actions occurred when the law regarding patronage dismissals was "clearly established" in this Circuit.

 The doctrine of qualified immunity protects defendants sued in their individual capacities from liability for money damages under § 1983. *See Roldan–Plumey v. Cerezo–Suarez,* 115 F.3d 58, 65 (1st Cir.1997). Qualified immunity has been recognized as immunity from suit rather than a mere defense to liability. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Government officials who perform discretionary functions are shielded from liability when, looked at objectively, their conduct does not violate " 'clearly established' statutory authority or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 704 (1st Cir.1993); *Singer v. State of Maine,* 49 F.3d 837, 844 (1st Cir.1995)). Thus, the inquiry is not solely whether Defendants violated Plaintiffs' constitutional rights, because "[t]he fact that a violation occurred is not enough to pierce the shield of qualified immunity 'un-

4. The Third Circuit elaborated on the issue of an alleged unconstitutional implementation of legislation in *Carver v. Foerster,* stating that "an unconstitutional or illegal course of conduct by county government does not fall within the doctrine of absolute immunity merely because it was connected to or followed by a vote of a county board." *Carver,* 102 F.3d at 101. The *Carver* Court pointed out that the plaintiffs had claimed harassment and other retaliatory conduct targeted at specific individuals because of their support

of a political adversary, and that the Commissioner's actions could not "be made 'legislative' simply by eliminating plaintiffs' positions instead of firing them outright." *Id.* at 100. The Third Circuit's discussion of unconstitutional motive, however, does not seem to be proper in the context of legislative immunity. As is made clear in *Bogan,* the question of whether Defendants' acts are functionally legislative is "logically prior" to any examination of intent or motive. *Bogan,* 118 S.Ct. at 973.

less it is further demonstrated that [the defendants'] conduct was unreasonable under the applicable standard.'" *Quintero de Quintero v. Aponte–Roque,* 974 F.2d 226, 228 (1st Cir.1992) (quoting *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *accord Amsden v. Moran,* 904 F.2d 748, 751 (1st Cir.1990)).

In political discrimination cases, the First Circuit has consistently held that a defendant is shielded by qualified immunity when "the job in question 'potentially concerned matters of a partisan political interest and involved at least a modicum of policymaking responsibility, access to confidential information, or official communication.'" *Figueroa–Rodriguez v. Lopez–Rivera,* 878 F.2d 1478, 1481 (1st Cir.1989) (quoting *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1259 (1st Cir.1987)). The law delineating the types of positions for which political affiliation is appropriate had not been clearly established in the First Circuit until the late 1980's or early 1990's. *See Roldan–Plumey* 115 F.3d at 65–66; *Nereida–Gonzalez,* 990 F.2d at 704; *Figueroa–Rodriguez,* 878 F.2d at 1480. Therefore, defendants who dismissed employees based on their political affiliation prior to this time were shielded by qualified immunity. *See Id.*

■ Defendants' actions in this case occurred from late 1996 through 1997, after the law regarding political dismissals had been clearly established in the First Circuit. *See Roldan–Plumey* 115 F.3d at 65–66. If a right is clearly established, it is presumed that the "defendant knew or should have known that his conduct was beyond the pale." *See Buenrostro v. Collazo,* 973 F.2d 39, 42 (1st Cir.1992). Defendants, however, do not argue or address the issue of whether the positions at issue were positions involving policy-making or access to confidential information. Rather, Defendants claim that Mayor Vera and González acted in an objectively reasonable manner and in conformance with relevant legal standards by proposing and implementing the Layoff Plan based on Puerto Rico Law 81.

Defendants bear the burden of presenting evidence in support of their immunity claim that shows Plaintiffs' positions included policymaking responsibility, access to confidential information, or official communication. *See Maldonado Maldonado v. Lausell,* 681 F.Supp. 111, 114 (D.Puerto Rico 1988) (Pieras, J.). Plaintiffs have satisfied their initial burden of demonstrating that the legal right at issue is "clearly established." *See Davis,* 468 U.S. at 197, 104 S.Ct. 3012. Defendants' emphasis on the fact that their conduct was "objectively reasonable" because they acted pursuant to Puerto Rico Law 81 in the Layoff Plan, however, is not sufficient to meet their burden under the relevant legal standard and to grant them qualified immunity.

■ Even if the Court "objectively" considers the fact that Defendants allegedly followed Law 81 in the analysis of qualified immunity, Plaintiffs have proffered evidence of a triable issue of fact regarding a potentially discriminatory application of the Layoff Plan. The usual summary judgment standards apply to a pre-trial motion asserting the defense of qualified immunity. *See Singer v. State of Maine,* 49 F.3d 837, 844 (1st Cir.1995) (quoting *Amsden v. Moran,* 904 F.2d 748, 752 (1st Cir.1990)). Plaintiffs have presented evidence, in the form of deposition testimony and affidavits, indicating that Defendants may have been acting out of a politically discriminatory motive in implementing the Layoff Plan. (Pls.' Exs. 2, 4–19).[5]

Therefore, Defendants are not entitled to qualified immunity for their allegedly discriminatory actions merely because they assert they acted pursuant to Law 81. In addition, Defendants' have not proffered any evidence to show that the eliminated positions were the type subject to patronage dismissal. Therefore, Defendants are not shielded from liability by qualified immunity.

### C. Municipal Liability

Defendants also argue that the Municipality cannot be held liable for Plaintiffs' alleged deprivations of rights under § 1983. Defendants assert that in order for the Municipality to be held liable, Plaintiffs must show that

---

**5.** *See infra,* Section III D, discussing evidence of political discrimination.

the Municipality's legislative body or authorized decision-maker has intentionally deprived Plaintiffs of a federally protected right. In support of their argument, Defendants claim that no "deliberate action" violating Plaintiffs' constitutional rights can be attributed to the Municipality itself as Mayor Vera and González's actions "were motivated and relied upon a well-ordered and organized plan." (Defs.' Mem.Law, at 14) In addition, Defendants claim that Plaintiffs have not sufficiently alleged a "policy" of harassment to permit the Municipality to be held liable.

Plaintiffs do not directly address or oppose Defendants arguments regarding municipal liability in their Opposition Motion. In parsing through Plaintiffs' Complaint and Opposition Motion, the Court has determined that Plaintiffs consider the Municipality as equally responsible for their unconstitutional dismissal. (Compl.¶¶ 14–15) Plaintiffs appear to attribute Mayor Vera's alleged unconstitutional acts in implementing the Layoff Plan and political harassment by Mayor Vera and other municipal employees to the Municipality itself. (Pls.' Mem.Law Supp.Mot. Opp'n. Summ.J. at 3–8)

In the landmark decision of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court overruled its previous decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and held that local governmental bodies can be "sued directly under § 1983 for monetary, declaratory, or injunctive relief where .... the action that is alleged to be unconstitutional imple-

ments or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. *Monell* also stands for the proposition that a municipality cannot be held liable solely because it employs a tortfeasor or under a respondeat superior theory. *See id.* at 691, 98 S.Ct. 2018.

■ There are various ways to establish the existence of a policy or custom sufficient to impose § 1983 liability on a municipality. *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 8.5.2 (2d ed.1994). First, a municipality can be held liable under § 1983 for the passage of a single ordinance or piece of legislation. *See Scott–Harris v. City of Fall River*, 134 F.3d 427, 436 (1st Cir.1997), *rev'd on other grounds, Bogan*, 118 S.Ct. at 972–73. (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Therefore, a municipality can be liable if an ordinance is passed which violates a plaintiff's First Amendment Rights.[6] *See id.*

■ Defendants' argument suggests an additional way in which a municipality can be held liable under § 1983, through the actions of officials with final authority for making municipal decisions. Municipal liability cannot be imposed merely because an employee has discretionary authority, but rather, the decision must be made by an official responsible for establishing final policy. *See Pembaur*, 475 U.S. at 483–84, 106 S.Ct. 1292. The

---

6. If an ordinance is facially neutral, municipal liability can only attach if the legislative body passing the ordinance acted out of a constitutionally impermissible motive. *See Scott–Harris*, 134 F.3d at 436. The inquiry into a legislative body's motive for passing legislation focuses on whether or not the individual legislators involved in the decision possessed improper motives. *See id.* A plaintiff can prove a legislator's improper motive through either direct or circumstantial evidence. *See id.* at 436–37 (citing *United States v. City of Birmingham*, 727 F.2d 560, 564–65 (6th Cir. 1984); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064–65 (4th Cir.1982)).

In *Scott–Harris*, the Court stated that a plaintiff should be able to demonstrate "both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." *Id.* at 438. The

Court provided examples of circumstances that would lead to an inference of improper motive, including procedural anomalies that were followed by a majority of the legislative body or evidence of an unusual level of community animus or constituent pressure.

In this case, Defendants do not specifically address the standard set out in *Scott–Harris*, nor have Plaintiffs proffered any evidence of irregularities in the passage of Ordinances 25 (199–97) and 20 (1997–98) or improper motives on the part of individual Municipal Assembly members. In fact, in the context of a discussion about legislative immunity, Plaintiffs concede that "Ordinance No. 20, 1997–98, is a legitimate act of Adjuntas' Municipal Assembly." (Pls.' Mem. of Law at 24) Therefore, there can be no municipal liability resulting from the passage of the Ordinances.

determination of whether an official has final decision-making authority in a particular area is a question of state law. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 119, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In *Small v. Inhabitants of the City of Belfast,* the First Circuit examined the issue of whether a city manager's actions in terminating plaintiff could be considered official policy, holding that liability could attach to the City of Belfast "by virtue of unconstitutional action taken on the part of the city manager, if he indeed had the final authority...." In so holding, the *Small* Court looked to both the Supreme Court's decision in *Pembaur* as well as the Eighth Circuit's ruling in *Williams v. Butler,* 746 F.2d 431 (8th Cir.1984). The Eighth Circuit had followed other circuits in concluding that "in areas where a local governmental official alone is the 'final authority or ultimate repository of ... power' the official's 'conduct and decisions must necessarily be considered those of one whose edicts or acts may fairly be said to represent official policy.'" *Williams,* 746 F.2d at 436 (quoting *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980)).

■ The question of whether a city or municipality has delegated final authority regarding personnel decisions to an official is a question of fact based on state law. *See Berdin v. Duggan,* 701 F.2d 909, 914 (11th Cir.1983) (upheld district court ruling that mayor's actions constituted official policy, in part, because Florida ordinance granted mayor authority over city employees without limit on discretion). Neither Defendants nor Plaintiffs have addressed the issue of whether or not Mayor Vera had the final authority regarding implementation of the Layoff Plan.

■ Plaintiffs allege in their Complaint that Mayor Vera "formulates, implements, direct, [sic] the public policy in the Municipality of Adjuntas." (Compl.¶ 6) Defendants' Statement of Uncontested Facts also seems to imply that Mayor Vera had final authority in implementing the Layoff Plan. (Defs.' Exs. ¶¶ 17–33, 35–37) The Court, however, must look beyond Plaintiffs and Defendants' allegations and to Puerto Rico law. Two provisions of the Puerto Rico Civil Code regarding the powers, duties and functions of a municipal mayor are potentially applicable:

> The Mayor shall exercise the executive power in the municipalities and shall have those powers, duties and functions vested in him herein, as well as those incidental to the same:
>
> (1) To organize, direct and supervise all the municipal administrative functions;
>
> (15) to appoint all the officials and employees of the municipal executive branch, and remove them from office whenever necessary for the good of the service, pursuant to the procedures provided herein.

P.R.Laws Ann. tit. 21, § 3002(1) & (15) (1980). Although these provisions are potentially relevant, based on the evidence before the Court, it is unclear whether either of these sections apply to Mayor Vera's authority in implementing the Layoff Plan.

The Court, therefore, concludes that neither the facts alleged by Plaintiffs in their Complaint, the evidence in the record, nor Puerto Rico law definitively answers the question of whether Mayor Vera was a final decisionmaker in relation to the implementation of the Layoff Plan. As there are genuine issues of fact as to whether or not Mayor Vera's implementation of the Layoff Plan constituted final municipal policy, the Court cannot grant summary judgment for Defendants on this issue.[7] *See Comfort v. Town of*

---

7. Defendants' assertion that the municipality did not have the requisite state of mind of "deliberate indifference" for municipal liability and citation to *Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) does not alter the Court's decision. In *Bryan County,* the Court held that a plaintiff must also demonstrate, in addition to identifying conduct attributable to the municipality, that the municipality was the "moving force" behind the alleged injury. *Bryan County,* 117 S.Ct. at 1388. In order to make the requisite showing, the Court stated that "the conclusion that the action taken or directed by the municipality or its authorized decisionmaker *itself* violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.* at 1389. If Mayor Vera did implement the Layoff Plan in a discriminatory way, his actions were unconstitutional and can be considered the "moving force" behind Plaintiffs' complaints.

*Pittsfield,* 924 F.Supp. 1219, 1234 (D.Maine 1996) (denial of summary judgment because issues of fact as to whether officer had policymaking authority).

█ The Court's inquiry, however, does not end here. Defendants also claim that the Municipality cannot be held liable for the alleged harassing actions of its employees as Plaintiffs have not sufficiently shown a "policy" of harassment. Plaintiffs do not directly address this argument, but cite to various portions of Plaintiffs' deposition testimony. Several Plaintiffs testify that they heard their supervisors make comments implying that they were being treated poorly because of their political affiliation, and that this was at the direction of "higher up" municipal officers. (Pls.' Ex. 2, 4, 7, 9–12, 18)

█ In order for a municipality to be held liable for a "policy" or "custom," a plaintiff must demonstrate that the "custom or practice is so 'wellsettled and widespread' that the policy-making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997) (quoting *Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir.1989)); *see also Bryan County,* 117 S.Ct. at 1388 ("an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.") (citations omitted); *Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir.1987) (custom may be attributed to a municipality when actual or constructive knowledge "of such a course of customary practices among employees subject to the policymaker's delegated responsibility for oversight and supervision"). Constructive knowledge of a policy may be implied if "the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal policymakers should have known of them." *Bordanaro v. McLeod,* 871 F.2d at 1157.

The evidence of municipal policy proffered by Plaintiffs, taken in the light most favorable to them, shows that various supervisors and other municipal employees acknowledged that Plaintiffs were being treated differently because of their political affiliation. (Pls.' Ex. 2, 4, 7, 9–12, 18) In addition, many of these supervisors claimed to be acting on the orders of "higher up" officials within the Municipality, including Mayor Vera and González. (Pls.' Ex. 4, 7, 9, 11, 18) The Court finds that this evidence is sufficient to show that the alleged harassing conduct is so "wellsettled and widespread" as to attribute the custom or policy of harassment to the Municipality. The proffered evidence demonstrates that official policymakers, from departmental supervisors to Mayor Vera himself, either directly knew of the harassing conduct and/or were themselves the source of the alleged custom.

The Court must still engage in another step in its analysis of municipal liability. The alleged policy of harassment must have been the "moving force" behind the deprivation of constitutional rights. *Bordanaro,* 871 F.2d at 1157 (citations omitted). "There must be some 'affirmative link' between the municipal custom and the constitutional deprivation." *Id.* (citations omitted). Essentially, a plaintiff must show that municipal employees were following the alleged custom when their rights were violated. *See id.* As discussed above, Plaintiffs claim that municipal supervisors made comments regarding their NPP affiliation in connection with the alleged harassment itself. This demonstrates the necessary "affirmative link" between the harassing conduct and policy of political discrimination. Therefore, the Municipality can be held liable for acts related to the policy of harassment based on NPP political affiliation.

## D. Political Discrimination

In addition to their claims of immunity and a lack of municipal liability, Defendants argue that Plaintiffs have failed to put forth evidence sufficient to sustain a claim for intentional discrimination based on political affiliation. Defendants' main assertion is that they would have taken the same actions in implementing the Layoff Plan regardless of Plaintiffs' political affiliation. (Defs.' Mem. Law Supp.Mot.Summ.J. at 8–9) In support of their claim of a lack of discriminatory ani-

mus. Defendants again rely on the fact that they allegedly followed the procedures required by Puerto Rico Law 81 in the implementation of the Layoff Plan. In addition, Defendants' also assert that although there have been new hires in the Municipality, these new employees have not been hired into career positions, but rather are contract employees who are paid through external funds.

Plaintiffs, on the other hand, argue that they have satisfied their burden of showing that political discrimination and harassment were substantial and motivating factors behind Defendants' actions. Plaintiffs allege that evidence supporting Defendants' discriminatory animus includes: that there was a highly charged political atmosphere; that the elections and Plaintiffs' dismissals were close in time; that they have been discriminated against and treated differently than PDP employees in relation to their job duties and functions; that they were replaced by PDP employees; and that they were harassed because of their political affiliation. (Pls.' Mem.Law Sup.Mot. Opp'n. Summ.J. at 11)

On a motion for summary judgment, a plaintiff bears the initial burden of showing that political discrimination was the substantial or motivating factor in a defendant's employment decision. *See Aviles–Martinez v. Monroig,* 963 F.2d 2, 5 (1st Cir.1992) (citing *Mt. Healthy City School Dist. Br. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If a plaintiff meets this initial burden, a defendant must show that it would have made the same decision regardless of the plaintiff's political affiliation. *See Id.; Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 39 (1st Cir.1993). A plaintiff, however, will still prevail " 'if it is found that she would not have been fired but for her political affiliation.' " *Aviles–Martinez,* 963 F.2d at 5 (quoting *Acosta–Sepulveda v. Hernandez–Purcell,* 889 F.2d 9, 13 (1st Cir.1989)). To make such a showing, a plaintiff must show that a "causal connection exists between the adverse treatment and the plaintiff's political affiliation." *Id.* (citing *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 58 (1st Cir.1990)).

To demonstrate that political discrimination was the motivating factor behind a plaintiff's dismissal, the First Circuit has held that circumstantial evidence alone can support a finding of political discrimination. *See Anthony v. Sundlun,* 952 F.2d 603, 605 (1st Cir.1991); *Estrada–Izquierdo v. Aponte–Roque,* 850 F.2d 10, 14–15 (1st Cir.1988). The operative question is "does the circumstantial evidence, taken as a whole, give rise to a plausible inference of discriminatory animus which, ultimately possesses enough convictive force to persuade a rational factfinder that the defendants' conduct was politically motivated?" *Anthony,* 952 F.2d at 606. Factors that have been found to show discriminatory animus include the fact that the plaintiff was a known member of the opposing political party, that the position was then filled by a member of the opposite political party, and that everyone of the plaintiff's party was demoted after a change in office. *See Rodriguez–Pinto,* 982 F.2d at 40; *Rivera–Ruiz v. Gonzalez–Rivera,* 983 F.2d 332, 335 (1st Cir. 1993).

█ The Court finds that Plaintiffs have proffered evidence sufficient to sustain their initial burden on summary judgment. It is undisputed that Plaintiffs are all members of the NPP while the new administration was run by the PDP. In addition, while some PDP members initially lost their positions, the majority were NPP affiliates. The most compelling evidence, however, includes the fact that some NPP members were replaced by PDP members (Pls.' Ex. 4–6, 8, 13, 15), that some Plaintiffs' job functions were diminished and they were subject to harassment based on their political affiliation (Pls.' Ex. 2, 5, 6, 7–13, 15, 17–18), and that comments were made by Mayor Vera and other municipal supervisors regarding Plaintiffs' political affiliation. (Pls.' Ex. 2, 7, 9–12, 16)

Two Plaintiffs claim to have heard Mayor Vera make discriminatory statements related to the political affiliation of NPP members. Gladys Delgado Pérez alleges that while she was picking up money off the street after a marathon, Mayor Vera drove by and said "[derogatory term], that's just how I wanted to see you, picking up money like a beggarwoman" (Pls.' Ex. 2), and she interpreted this

remark as directed at her as an NPP affiliate. Even more compelling, Aurora Cabán Maldonado, a Practical Nurse, claims she heard Mayor Vera say in a meeting that "he had to lay us off to give work to the people who had helped him run the campaign." (Pls.' Ex. 16 at 8)

Based on the evidence described above, Plaintiffs have put forth sufficient evidence to sustain their initial burden that Defendants' employment decisions were based on improper and discriminatory motives. Defendants have, however, put forth evidence in support of their burden that regardless of Plaintiffs' political affiliation, the municipal budgetary crisis required the to cut municipal jobs on the basis of seniority. Defendants' claims are supported by evidence in the form of communication with municipal employees regarding the proposed layoff, option of hearings for employees who disputed their dismissals, and lists of laid-off employees ranked by seniority. (Defs.' Ex. 8–16, 27)

The Court finds that this proffer of evidence is sufficient to demonstrate that regardless of political affiliation, Defendants would have made the same decision in laying off Plaintiffs. The documentation including seniority lists and letters sent to Municipal employees provides evidence that Defendants implemented the Layoff Plan fairly, and based on seniority. Therefore, the Plaintiffs must now show that they would not have been fired "but for" their political affiliation. *See Rodriguez–Pinto,* 982 F.2d at 39; *Aviles–Martinez,* 963 F.2d at 5.

In considering Plaintiffs' evidence of causation, the Court looks to the evidence previously discussed, in addition to the specific proffers by several Plaintiffs regarding their positions in the Municipality. Nora López Maldonado asserts in her deposition that she was substituted by a PDP member with less seniority in her position as Director of the Children's Park. (Pls.' Ex. 5, replaced by Migdalia Rodríguez) The Court finds that, construing this evidence in the light most favorable to Plaintiffs, it provides evidence of a causal link between Nora López Maldonado's termination and her political affiliation. If Plaintiff was, in fact, replaced by someone of less seniority, this refutes Defendants' claim that Municipal employees were terminated in an unbiased manner. Defendants, however, argue that because the substitution of Migdalia Rodríguez for Nora López Maldonado occurred prior to the implementation of the Layoff Plan, this cannot show any discriminatory animus on the part of Defendants. The Court, however, disagrees with Defendants' argument. Even if the replacement occurred prior to the implementation of the Layoff Plan, it occurred after the PDP came into power, indicating that Nora López Maldonado was potentially replaced because of her political affiliation. One can infer that by replacing NPP members prior to the Layoff Plan, Defendants attempted to cover up any evidence of discriminatory animus related to the implementation of the Layoff Plan itself. Therefore, Plaintiff Nora López Maldonado has met her burden at this stage to show she would not have been let go "but for" her political affiliation.

The following Plaintiffs have also provided evidence sufficient to meet their burden on causation: Sonia E. Berm údez–Sepúlveda, Practical Nurse (Defs.' Ex. 29, Dep. at 10–11, replaced by Rosin Santiago); Helga Maldonado Rodríguez, Clerk (Pls.' Ex. 11, replaced by José Oquendo); Aurea Martínez Rivera, Clerk (Pls.' Ex. 8, replaced by Vilma Padilla Agrón); Migdalia Pagán Reyes, Clerk (Pls.' Ex. 15, replaced by Juanita Borrero); Miguel Angel Rivera González, Public Works Driver (Pls.' Ex. 13, replaced by PDP members); Maribel Rodríguez Vega, Clerk (Pls.' Ex. 6, replaced by Rivera Del Valle). Each of these Plaintiffs allege that their job functions were being performed by a PDP member prior to the layoff date. Defendants refute this claim, arguing that these Plaintiffs were replaced by non-career employees, and therefore, there can be no inference of discrimination.

The Court finds that discriminatory animus can be inferred by Defendants' replacement of NPP members with PDP members in the same job function but with a different name or type of position. Even if the jobs filled by PDP members are not career positions, the fact that NPP members lost their jobs while PDP employees were hired to

perform the same functions under a different job title can lead to an inference of discrimination. In addition, the fact that Plaintiffs were not notified of the possibility of placing their name on the "Registry of Eligibles," which would have given them seniority for any opening in the Municipality, also supports an inference of discriminatory animus. (Pls.' Ans. Defs.' Reply Pls.' Mot. Opp'n. Summ.J. at 11) Thus, summary judgment for the above-named Plaintiffs is hereby **DENIED.**

Defendants have provided the Court with a list of employees hired by the Municipality from January 1, 1997 to the present, indicating their positions and dates hired. (Defs.' Ex. 26) Defendants claim that of the 77 employees listed, 20 are employees that had been previously laid-off, and ten of these re-hired employees are Plaintiffs in this action. The list provided by Defendants indicates the name of the newly-hired employee along with his or her job title. It is difficult, however, for the Court to discern an employee's job duties or functions based on the job title listed in Defendant's exhibit. For example, employees numbered 19–27, 36–40, 52–59, and 72–77 are listed as having the position of "Class 1 Worker." Neither Plaintiffs nor Defendants provide any additional information regarding these newly created positions, and it is not clear what functions these employees perform. Thus, except for the above-named Plaintiffs that have indicated the name of their replacement, the Court cannot determine whether the employees listed by Defendants were hired to perform duties previously done by Plaintiffs.

The Court finds that based on the evidence in the record, it cannot determine whether the new positions created by the Municipality are positions which could have been filled by any of the Plaintiffs. Therefore, the Court is not in a position to grant or deny summary judgment regarding the sufficiency of evidence for the claims of Plaintiffs not named above. Before making a final determination as to any political discrimination claims, the Court needs more evidence regarding the job duties of the positions created after January 1, 1997. This evidence can include the following: personnel files of the newly hired employees, evidence regarding the hiring criteria used to fill the newly created position, testimony from the person in charge of hiring new employees, and any other evidence that indicates whether Plaintiffs could have been placed in the new positions.

Therefore, Plaintiffs **SHALL** come forth with additional evidence demonstrating that the positions created by Defendants could have been filled by Plaintiffs on or before **December 18, 1998.** This showing must include **specific** evidence related to a particular Plaintiff and position that is currently filled by a PDP affiliate. If Plaintiff fails or is unable to make such a showing, summary judgment will be granted for Defendants for the remaining Plaintiffs.

## V. Political Harassment

In addition to their claims of unjust dismissal, Plaintiffs also make a separate claim for "political harassment." (Compl.¶ 15) Defendants first point out that only 77 of original Plaintiffs mentioned harassment in their answers to interrogatories. (Defs.' Mem. Supp.Summ.J. at 18) Defendants further assert that the remaining allegations are not sufficient to support a prima facie case of political harassment, nor are any of the allegations so severe as to constitute a violation of constitutional magnitude under *Agosto-de–Feliciano v. Aponte–Roque,* 889 F.2d 1209 (1st Cir.1989).

The First Circuit has recognized that employment actions less than dismissal can constitute political discrimination when a plaintiff's "work situation is unreasonably inferior to the norm for the position" such that "the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view." *Agosto–de–Feliciano,* 889 F.2d at 1218. The United States Supreme Court has also addressed the issue of First Amendment protection against patronage dismissals in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In *Rutan,* the Court extended First Amendment protection to "promotions, transfers, and recalls after lay-offs." *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729. The Court also suggested that any adverse action, no matter how minor, violates the

First Amendment if it is in retaliation for an employee's exercise of First Amendment Rights. *See id.* at 76 n. 8, 110 S.Ct. 2729 ("the First Amendment . . . . already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . . when intended to punish her for exercising her free speech rights.'" (citations omitted)).

The First Circuit has not directly addressed the effect of *Rutan* on its "unreasonably inferior" standard, but did state in dicta that regarding the above quoted passage:

we do not regard such colorful rhetoric as necessarily foreclosing something like the "unreasonably inferior" rule for personnel actions short of demotions or transfers. The Rutan court was concerned with "deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy", *id.* at 75, 110 S.Ct. 2729, a formulation similar to Agosto–de–Feliciano's standard. . . . We leave the resolution of any conflict in the standard for such adverse personnel actions to some future case.

*Acosta–Orozco,* 132 F.3d 97, 101 n. 5 (1997). Thus, it is unclear how the First Circuit views the *Rutan* dicta as affecting its "unreasonably inferior" standard. It appears, however, that a plaintiff can maintain a cause of action for seemingly trivial retaliatory actions that cause a work situation to be "unreasonably inferior" to the normal working conditions of the position.

A plaintiff's burden in a case involving politically motivated actions less than dismissal is more demanding than that of the usual civil litigant opposing summary judgment. *See Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 39 (1st Cir.1993). "[T]he record must contain evidence which would allow the fact finder to conclude, by clear and convincing evidence, that the nonmoving employee's new position is 'unreasonably inferior to the norm.'" *Id.* (citing *Agosto–de–Feliciano,* 889 F.2d at 1220). In certain situations, a factfinder would be entitled to find an employee's job situation to be "unreasonably inferior," including when: (1) the employee has been stripped of responsibilities and the responsibilities have been reassigned to a subordinate; (2) the employee has been stripped of supervisory status and right to work independently on significant projects; (3) the employee has endured a sustained and significant general worsening of employment conditions. *Id.*

After combing through the record in this case, the Court has determined that the following Plaintiffs have put forth affirmative evidence regarding claims for harassment based on their political affiliation after the new administration took over on January 17, 1997:

(1) José D. Aponte–Rivera, Citizens' Affairs Technician: claims he was not performing any functions related to his position, but rather was sent to work in the area of recreation and sports. (Defs' Ex. 29, Dep. at 17–20)

(2) Sonia E. Bermúdez–Sepúlveda, Practical Nurse: claims she was not given work and not allowed to use the telephone. (Defs.' Ex. 29, Dep. at 11–12)

(3) José D. Betancourt–Ortiz, Clerk: states that he was relieved of all of his functions, and that he and other NPP members were isolated. In addition, he was not allowed to receive incoming phone calls. (Defs.' Ex. 35, Dep. at 11, 20)

(4) Juan Antonio Breban–Caraballo, Cleaning Supervisor: alleges that he was forced to do a laborer's job even though he was a supervisor, and further that he was forbidden from making phone calls. (Defs.' Ex. 32, Dep. at 13)

(5) Brunilda Caraballo–Ramos, Citizens' Help Technician: states that she was not assigned work and forbidden to have breakfast. (Defs.' Ex. 29, Dep. at 17, 21)

(6) Luis Castro–Ruiz, Clerk: claims he was transferred to another school because of his political affiliation. (Defs.' Ex. 33, Dep. at 10)

(7) Gladys Delgado Pérez, Clerk: claims she was sent to do maintenance work, not in her job function, for political reasons. (Pls.' Ex. 2 at 10; Defs.' Ex. 29, Dep. at 10)

(8) Wanda I. Estronza–Martínez, Secretary: states her duties were given to an-

other secretary. (Defs.' Ex. 38, Dep. at 7–8)

(9) Angel Estronza–Vélez, Loader Operator: states he was not allowed to take a bathroom break, and that he had to sign a sheet to leave. (Defs.' Ex. 37, Dep. at 13)

(10) Juanita González–Acevedo, Clerk: alleges that some of her duties were taken away, that she had to work weekends when PDP members did not, and that she was not allowed to receive phone calls. (Defs.' Ex. 29, Dep. at 8, 12–13, 15)

(11) Nora López–Maldonado, Children's Park Administrator: claims she did not do the same functions. (Defs.' Ex. 29, Dep. at 19)

(12) Jesús Nolasco–Vélez, Citizens' Help Technician: claims most duties were taken away and that he was forced to paint houses for the patron saint. In addition, had problems when he wanted to have breakfast, he had to go to other side of complex to use the restroom, and was left without electricity. (Defs.' Ex. 29, Dep. at 16–18)

(13) Héctor L. Madera–López, Sports Supervisor: alleges that bathroom was not always open, and thus, went to his own house to go to the bathroom. (Defs.' Ex. 29, Dep. at 28)

(14) Luis Norberto Madera–López, Sports Deputy Director: claims he was sometimes denied the use of restrooms and other times had to go to his mother's house to use the bathroom. (Defs.' Ex. 29, Dep. at 31–32)

(15) Aurea M. Martínez Rivera, Clerk: claims her job functions, work supplies, and furniture were taken away. (Pls.' Ex. 8 at 9–12)

(16) Antonio Ortiz–De Jesús, Janitor: claims his custodian duties were taken away from him and performed by persons brought under contract. In addition, he alleges that he had to sign a list to leave for breakfast, and that he could not use the telephone. (Defs.' Ex. 35, Dep. at 8–9, 14, 18)

(17) Miguel S. Ostolaza Miró, Cleaning Deputy Director: alleges that he was not allowed to work. (Pls.' Ex. 7 at 17)

(18) Migdalia Pagán Reyes, Clerk: was told by supervisor not to get involved in politics and not to attend political events. (Pls .' Ex. 15, at 18–20)

(19) Luis Plaza García, Workers' Supervisor: he and other NPP affiliates were treated differently than PDP affiliates in that NPP employees were constantly monitored, and not allowed to go on break at any time. (Pls.' Ex. 17, at 19–20)

(20) Edwin A. Plaza–Ruiz, Administrative Assistant: claims he was sometimes not given a breakfast break and would have to sign a paper to go on break. (Defs.' Ex. 29, Dep. at 35).

(21) Oscar Quiñones–Salcedo, Driver: claims he was locked up in a trolley and not allowed to have breakfast. He also alleges that the only work he was offered was to work on a "loader," but the loader had no breaks. (Defs.' Ex. 37, Dep. at 10–11)

(22) Miguel Angel Rivera González, Public Works Driver: claims he went for two months without job functions and had to ask for permission to go to city hall. (Pls.' Ex. 13 at 14, 16, 18)

(23) Iris Rivera–Pérez, Clerk: beginning on February 15, 1997, was transferred to "a shack" and had no duties at all. In addition, claims that there were no adequate restrooms and that the office was in bad condition. (Defs.' Ex. 29, Dep. at 2)

(24) Luz M. Rivera–Santiago, Clerk: alleges that was not allowed to use the phone. (Defs.' Ex. 29, Dep. At 12)

(25) Javier Rivera–Vega, Citizens' Affairs Technician: claims that was unable to use the phone and some restrooms were closed. (Defs.' Ex. 29, Dep. at 7–11)

(26) Arístides S. Rodríguez–Quiles, Citizens' Affairs Technician: claims he no longer had his job functions, but was required to knock down homes and carry lumber for patron saint festivals. Because of this, he claims he acquired a nervous condition. In addition, he alleges that he was not allowed to use the telephone and had to go to a different building to use the restroom, which sometimes caused him to get wet because of the rain. (Defs.' Ex. 29, Dep. at 7–11)

(27) Maribel Rodríguez Vega, Clerk: claims that NPP employees were not allowed to take breakfast break while PDP employees took such breaks. (Pls.' Ex. 6 at 23)

(28) José A. Román–Torres, Clerk: says he had to sign a permission slip in order to leave the workplace. (Defs.' Ex. 29, Dep. at 12)

(29) Nora E. Ruiz–González, Assistant Warehouse Watchman: states that she performed no job functions. (Defs.' Ex. 31, Dep. at 14)

(30) Miguel A. Santana Pérez, Clerk: alleges he performed no functions related to his job, only painted and picked up leaves. (Pls.' Ex. 4 at 10)

(31) Lillian Torres Cabán, Clerk: states that new administration took away her job functions because she not from the "right party." Torres also claims she was not able to use the telephone. (Pls.' Ex. 18 at 13)

(32) Edwin R. Vélez–Plaza, Recreational Complex Deputy Director: claims he was not allowed to use the phone and was not given any duties. (Defs.' Ex. 31, Dep. at 16, 18)

■ To rebut Plaintiffs' claims, Defendants' provide evidence that certain actions taken by the Municipality and alleged by Plaintiffs as part of a campaign of political harassment are legitimate efforts to enable the Municipality to be more efficient. This evidence includes an affidavit by Mayor Vera stating that there were huge Municipal telephone bills from the prior administration, and that the telephone statements reflected calls not related to municipal business. (Defs.' Ex. 26, ¶ 10) In addition, Defendant González provides an affidavit stating that (1) the use of municipal telephones was restricted to official business; (2) a form was used to inform the Municipality of the whereabouts of an employee when leaving the working area; and (3) instructions were given permitting only a 15 minute breakfast break after 9:00 a.m. (Defs.' Ex. 27 at ¶¶ 13–15)

The Court finds that Defendants' proffer of evidence is sufficient to support their position that the changes regarding telephones, sign in sheets, and the timing of breakfast breaks were made pursuant to a legitimate reason and that "the changes would have been made regardless of political affiliation." *Rodriguez–Pinto*, 982 F.2d at 39 (quoting *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568). Therefore, summary judgment is **GRANTED** for Defendants for the following Plaintiffs who only allege claims relating to the use of the telephone, the timing of breakfast breaks, and the use of sign-in sheets: Luz M. Rivera–Santiago and José A. Román–Torres.

■ The other Plaintiffs named above have alleged further harassment, including that their job functions were decreased or eliminated, that they were forced to do menial work not related to their job functions, that they were not allowed to go to the bathroom and/or the bathroom was not always available, and that they were not allowed to take breakfast breaks. The Court finds that these allegations are sufficient to state a claim for political harassment under *Agosto–de–Feliciano* and *Rutan.* If Plaintiffs' allegations are true, a finder of fact could determine that Plaintiffs have put forth clear and convincing evidence that their positions are "unreasonably inferior to the norm." Plaintiffs' allegations that they were stripped of their job functions and/or that they were required to perform menial tasks not within their job functions are similar to those described in *Rodriguez–Pinto*, 982 F.2d at 39. In addition, not being able to use the bathroom when necessary is sufficient to show that Plaintiffs have "endured a sustained and significant general worsening of employment conditions." *Rodriguez–Pinto*, 982 F.2d at 39. Plaintiffs claims that they were not allowed to take breakfast breaks while PDP affiliates were allowed to take such breaks, though a closer call, can indicate a significant worsening of employment conditions. *See id.*

Summary judgment is, therefore, **DENIED** for the claims of political harassment for the following Plaintiffs: José D. Aponte–Rivera, Sonia E. Bermúdez–Sepulveda, José D. Betancourt–Ortiz, Juan Antonio Breban–Caraballo, Brunilda Caraballo–Ramos, Luis Castro–Ruiz, Gladys Delgado Pérez, Wanda I. Estronza–Martínez, Angel Estronza–Vélez,

Juanita González–Acevedo, Nora López–Maldonado, Jesús Nolasco–Vélez, Héctor L. Madera–López, Luis Norberto Madera–López, Aurea M. Martínez Rivera, Antonio Ortiz–De Jesús, Miguel S. Ostolaza Miró, Migdalia Pagán Reyes, Luis Plaza García, Edwin A. Plaza–Ruiz, Oscar Quiñones–Salcedo, Miguel Angel Rivera González, Iris Rivera–Pérez, Javier Rivera–Vega, Arístides S. Rodríguez–Quiles, Maribel Rodríguez Vega, Nora E. Ruiz–González, Miguel A. Santana Pérez, Lillian Torres Cabán, and Edwin R. Vélez–Plaza.

In addition, summary judgment is hereby **GRANTED** for the Plaintiffs not named above regarding any political harassment claims. These Plaintiffs are: Luis A. Acevedo–García, Anel Acosta Meléndez, José A. Alvarado, José E. Aponte Soto, Agustina Arce Rosado, Clara Ayala, Ana L. Cabrera, Miguel A. Camacho Díaz, Aurora Cabán Maldonado, Héctor Camacho Alicea, Domingo Caraballo Ortiz, Gabriel Caraballo Ortiz, Ivan Castro Jiménez, Miguel A. Castro Ruiz, Obed D. Cintron, Santa Gloria Cruz, David Cruz Irizarry, Juan De–Jesús Aponte Soto, Fermín Díaz Santiago, Nelly I. Echevarria–Perez, Héctor L. Filippetti Santiago, José A. García, Antonio González Acevedo, José A. González, Jacqueline González Vélez, Maria E. Irizarry Rodríguez, Blanca I. Maldonado–Molina, Helga E. Maldonado Rodríguez, Wanda N. Molina–Acevedo, Angel Munet Echevarria, José A. Plaza Rosado, Janisse M. Plaza Ruiz, Luz N. Pérez Jimenez, Luz N. Ramírez Plaza, Edirudis Ramos Quiñones, Francisco Reyes González, Luz M. Rivera Santiago, Harry Rivera Torres, José H. Rodríguez Vega, Elba I. Román Luciano, José A. Román Torres, José J. Rosado Alicea, Esther Rosado, Nilda E. Rosario Virola, Rubén Salcedo Rodríguez, Flor M. Santiago Nieves, José L. Santiago Rodríguez, Wanta I. Torres Laracuente, Awilda Torres Natal, Vilma Torres Rivera, Lilian Torres Natal, Norma Vazquez de Zayas, Elizabeth Vélez Caraballo, Isabel Velez Sepulveda, Martha Zayas Vazquez. The above-named Plaintiffs have not put forth any affirmative evidence of political harassment, and there is no additional evidence in the record to support such claims.

## VI. Conclusion

The Court finds that individual Defendants Mayor Vera and González are not entitled to absolute legislative immunity for their acts in implementing the Layoff Plan. In addition, the individual defendants are not entitled to qualified immunity as the right to be free from political discrimination and actual or constructive patronage dismissals was clearly established in the First Circuit in 1997. The Municipality itself can be held liable for the implementation of the Layoff Plan as well as for acts committed pursuant to the "policy of harassment" that existed within the Municipality.

Summary judgment is hereby **DENIED** for the Plaintiffs who have provided sufficient evidence of a triable issue of fact that Defendants were acting out of a discriminatory animus in their dismissals. These Plaintiffs include: Sonia E. Bermúdez–Sepúlveda, Nora López Maldonado, Aurora Martínez Pérez, Migdalia Pagán Reyes, Miguel Angel Rivera González, and Maribel Rodríguez Vega. Plaintiffs **SHALL** come forth with additional evidence demonstrating that the positions created by Defendants could have been filled by any of the Plaintiffs on or before **December 18, 1998**. After reviewing this additional evidence, the Court will rule on Defendant's Motion for Summary Judgment regarding the sufficiency of evidence for the political discrimination claims of the Plaintiffs not named above.

Summary judgment is **GRANTED** for Defendants regarding Plaintiffs' claims of political harassment for all the following Plaintiffs who have not provided the Court with affirmative evidence of an "unreasonably inferior" work situation: Luis A. Acevedo–García, Anel Acosta Meléndez, José A. Alvarado, José E. Aponte Soto, Agustina Arce Rosado, Clara Ayala, Ana L. Cabrera, Miguel A. Camacho Díaz, Aurora Cabán Maldonado, Héctor Camacho Alicea, Domingo Caraballo Ortiz, Gabriel Caraballo Ortiz, Ivan Castro Jiménez, Miguel A. Castro Ruiz, Obed D. Cintron, Santa Gloria Cruz, David Cruz Irizarry, Juan De–Jesús Aponte Soto, Fermín Díaz Santiago, Nelly I. Echevarria–Perez, Héctor L. Filippetti Santiago, José A. Gar-

cía, Antonio González Acevedo, José A. González, Jacqueline González Vélez, Maria E. Irizarry Rodríguez, Blanca I. Maldonado–Molina, Helga E. Maldonado Rodríguez, Wanda N. Molina–Acevedo, Angel Munet Echevarria, José A. Plaza Rosado, Janisse M. Plaza Ruiz, Luz N. Pérez Jimenez, Luz N. Ramírez Plaza, Edirudis Ramos Quiñones, Francisco Reyes González, Luz M. Rivera Santiago, Harry Rivera Torres, José H. Rodríguez Vega, Elba I. Román Luciano, José A. Román Torres, José J. Rosado Alicea, Esther Rosado, Nilda E. Rosario Virola, Rubén Salcedo Rodríguez, Flor M. Santiago Nieves, José L. Santiago Rodríguez, Wanta I. Torres Laracuente, Awilda Torres Natal, Vilma Torres Rivera, Lilian Torres Natal, Norma Vazquez de Zayas, Elizabeth Vélez Caraballo, Isabel Velez Sepulveda, Martha Zayas Vazquez.

IT IS SO ORDERED.