# United States Court of Appeals
## For the First Circuit

Nos. 02-1139, 02-1340, 02-1465

LUIS A. ACEVEDO-GARCIA, et al.,

Plaintiffs-Appellees/Cross-Appellants,

v.

ROBERTO VERA MONROIG, Individually and as Mayor of Adjuntas;
MUNICIPALITY OF ADJUNTAS; IRMA M. GONZALEZ DELGADO, Individually
and as Personnel Director of Adjuntas,

Defendants-Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. Senior District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Johanna M. Emmanuelli-Huertas, with whom Jorge Martinez
Luciano and Law Offices of Pedro A. Ortiz Alvarez were on brief for
the Municipality of Adjuntas.
Luis Villares Sarmiento, with whom Yahaida Zabala, and
Sanchez, Betances & Sifre, were on brief for appellants/cross-
appellees Vera and Gonzalez in their individual capacities.
Gael Mahony, with whom Israel Roldan-Gonzalez, Stuart Svonkin,
Erica Templeton, Michael E. Liftik, and Hill & Barlow were on brief
for appellees/cross-appellants.

August 21, 2003

**LIPEZ, <u>Circuit Judge</u>.**  This complex political discrimination case was filed by eighty-two plaintiffs terminated from career employment positions with the municipality of Adjuntas in Puerto Rico.  The district court severed the plaintiffs into four groups -- three groups of twenty and one group of twenty-two -- and the claims of the first twenty plaintiffs are now before us on defendants' appeal from a substantial verdict for plaintiffs.  Although this case raises many familiar issues, it also presents some unusual questions arising from the court's initial severance of the plaintiffs, and its later decision to apply non-mutual offensive collateral estoppel to the three remaining pieces of the severed litigation.  We vacate the court's collateral estoppel order, and affirm in all other respects.

## I.

On November 12, 1997, eighty-two current and former employees of the municipality of Adjuntas brought suit under 42 U.S.C. § 1983, alleging violations of their First, Fifth and Fourteenth Amendment rights arising from a massive layoff of municipal employees in the aftermath of the November 1996 mayoral election.  Every claimant was fired from a "career position" (akin to a civil service job), as opposed to a "trust position" (political appointment), temporary or transitory post, or "contract" (fixed term) job.  The plaintiffs named three defendants in the suit -- Roberto Vera Monroig ("Vera"), the mayor of Adjuntas

-2-

(sued in both his individual and official capacities); Irma Gonzalez, Adjunta's Director of Human Resources (sued in both her individual and official capacities); and the municipality of Adjuntas.[1]

On November 23, 1998, the district court issued an order and opinion denying absolute and/or qualified immunity to Mayor Vera and Gonzalez in their individual capacities, and granting in part and denying in part the defendants' motion for summary judgment. See Acevedo-Garcia v. Vera-Monroig, 30 F. Supp. 2d 141 (D.P.R. 1998) ("Acevedo I"). In an opinion published February 17, 2000, we affirmed the district court's order in all respects, ruling inter alia that defendants could not claim the protection of

---

[1]Defendants do not challenge the legal availability of municipal liability in this case. In Cordero v. De Jesus-Mendez, 867 F.2d 1 (1st Cir. 1989), we acknowledged the Supreme Court's holding in Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) that "municipality liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483-84 (emphasis added). The Cordero court subsequently noted that mayors in Puerto Rico are the government officials ultimately responsible for the employment decisions of the municipality:

> Under Puerto Rico law, one of the express powers given to mayors of municipalities is: "To appoint all the officials and employees of the municipal executive branch, and remove them from office whenever necessary for the good of the service, pursuant to the procedures provided herein." P.R. Laws Ann. tit. 21, ch. 155 § 3002(15) (1980).

Id. at 7. Hence, Defendant Vera's employment decisions ipso facto "constituted the official policy of the municipality." Id.

-3-

absolute immunity, and that we lacked jurisdiction to review the district court's rulings on qualified immunity and municipal liability.  See Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1 (1st Cir. 2000) ("Acevedo II").

Our decision in Acevedo II cleared the remaining roadblocks to trial, and the district court undertook the formidable logistical task of arranging to try the multitude of political discrimination, political harassment, and due process claims alleged by the eighty-two individual plaintiffs.[2]  To this end, the court issued an order on October 11, 2001, severing the case into four separate trials of twenty, twenty, twenty, and twenty-two plaintiffs, respectively.  To configure the first group of twenty plaintiffs, the order directed each side to choose six plaintiffs with political discrimination and due process claims only (for a total of twelve), and four plaintiffs prosecuting political discrimination, due process and political harassment claims (for a total of eight).

The trial for this first group began October 12, 2001, and lasted twenty-three days.  At the conclusion of the proceedings, the jury returned a verdict awarding each plaintiff a

---

[2]All eighty-two plaintiffs alleged political discrimination and due process violations.  Thirty-three of the eighty-two plaintiffs added a third claim of political harassment to their lawsuit.  The political discrimination and due process claims arose from the discharges themselves, while the political harassment claims alleged shoddy treatment in the months preceding the terminations.

package of compensatory and punitive damages totaling hundreds of thousands of dollars, summing to a group total of $6,956,400. After a flurry of post-trial motions, the court entered judgment on the verdict. It then issued an order on January 30, 2002, applying the doctrine of non-mutual offensive collateral estoppel to preclude defendants from litigating the defendants' liability for political discrimination and denial of the plaintiffs' due process rights. Acevedo-Garcia v. Vera-Monroig, 213 F. Supp. 2d 38, 41 (D.P.R. 2002).

Defendants filed a timely appeal after this first trial, challenging inter alia the sufficiency of the evidence at the summary judgment stage, the sufficiency of the evidence at trial, the severance of plaintiffs into four groups, the district court's denial of qualified immunity, numerous evidentiary rulings, the court's active participation at trial, the damage award, and the court's application of non-mutual offensive collateral estoppel. Plaintiffs cross-appealed from the district court's denial of an injunction ordering the reinstatement of all plaintiffs.

## II.

Acevedo I and Acevedo II provide a lengthy exposition of the background facts in this case. See Acevedo II, 204 F.3d at 4-7; Acevedo I, 30 F. Supp. 2d at 143-45. We summarize those facts

here, and supplement our recitation with an overview of the post-Acevedo II developments.[3]

## A.  Stipulated and Undisputed Facts

Defendant Vera, representing the Popular Democratic Party ("PDP"), won the November 1996 mayoral election in Adjuntas, and appointed Defendant Gonzalez, a fellow PDP member, to be the Director of Human Resources on January 14, 1997.  Vera and Gonzalez inherited a municipal government whose ranks were swelled by 115 new hires during the seven-year administration of Rigoberto Ramos, Vera's predecessor, and a member of the rival New Progressive Party ("NPP").  Of those 115 employees, only 2 were affiliated with the PDP.  By January 1997, the municipality employed 229 regular employees, and the parties stipulated prior to trial that "many departments were so overstaffed that some employees did not have desks."

On April 30, 1996, the Puerto Rico Comptroller's Office published an audit report, M-96-14, indicating that Adjuntas had accrued annual budget deficits of at least $1,000,000 from 1985 to 1990.  After Vera took office in January 1997, he commissioned a second financial audit of the municipality by Reinaldo Ramirez, a certified public accountant.  Ramirez presented his report on May

---

[3]The facts presented here are intended to convey a general impression of the case.  We provide additional facts in subsequent sections of the discussion where they are pertinent to the legal analysis.

8, 1997, informing city officials that the municipality had a budget deficit of over $5,000,000 and long term debts totaling more than $2,000,000. Anticipating this unwelcome news, Vera had previously hired a Human Resources Consulting firm in February 1997 to prepare a "Layoff Plan for Municipality of Adjuntas Employees" (the "Plan"). The consultants completed the Plan in March 1997, and it received approval from the Adjuntas Municipal Assembly on April 2, 1997 (as required under Puerto Rico's Autonomous Municipalities Act). See 21 P.R. Laws Ann. § 4551, as amended (1995) ("Law 81"). On April 11, 1997, a copy of the Plan was circulated to every municipal employee.

In broad strokes, the Plan (1) enumerated the steps the municipality was obliged to undertake before firing employees (including relocation, retraining, temporary unpaid leave, demotions to vacant positions, and voluntary retirement); (2) established an order of priority for laying off municipal workers; and (3) established a series of procedures for earmarking particular employees and job classifications for termination, and for providing notice to the affected individuals. The Plan was not self-executing. Instead, it authorized the termination of municipal employees "[w]hen the Mayor determines that there are financial problems and that as a result, programs or services are being affected." The Mayor made this determination in May 1997 after conferring with Ramirez and the Human Resource consultants,

-7-

and he ordered city officials to implement the Plan. When the dust settled on October 31, 1997, 102 employees, including 82 NPP members and 11 PDP members, had been fired from their career positions.

Since January 1, 1997, the municipality has hired seventy-seven new employees to "contract" or fixed-term jobs funded through non-municipal sources (i.e. federal and state programs). The most significant of these programs, referred to as "Law 52," allows municipalities to present job training proposals to the Labor Department of the Commonwealth of Puerto Rico, which may then appropriate funds on an annual basis to underwrite the salaries of a certain number of municipal employees that the city could not otherwise afford. Only five of the eighty-two plaintiffs received one of these seventy-seven appointments, the vast majority of which went to PDP members.

## B. Contested Facts

The trial featured a contentious dispute regarding the period preceding the October 31, 1997, layoffs. The twenty plaintiffs in the first trial group testified that, during this period, the defendants sabotaged their working conditions by denying NPP employees (and only NPP employees) basic amenities, including phone privileges, short work breaks for breakfast, access to restroom facilities, and the opportunity to drive municipal vehicles to perform their job functions. Many plaintiffs testified

that they were removed from their jobs entirely, and sent to random locations where they were either given nothing to do for months on end or else ordered to perform menial tasks outside the scope of their job descriptions. The defendants denied these allegations, contending that prior abuses of telephone privileges and municipal vehicles had contributed to large budget overruns that compelled the municipality to restrict access to these services. According to defendants, the dearth of functioning bathroom facilities was a consequence of plumbing and physical infrastructure deficiencies that were ignored during the previous NPP mayoral administrations.

There was also a factual controversy concerning the implementation of the Plan. The defendants insisted that the particular layoff scheme developed in accordance with the Plan was politically neutral in both its conception and implementation. Noting that prior NPP administrations had almost exclusively hired NPP members to fill over a hundred municipal positions in the preceding years, they claimed it was inevitable that a seniority-based layoff plan would disproportionately impact NPP employees.

Plaintiffs presented evidence of a different agenda. In their view, Mayor Vera manipulated the Plan to produce discriminatory results in three ways. First, he contravened provisions of the Plan by failing to seriously consider measures short of outright termination, including relocation, retraining, temporary unpaid leave, demotions to vacant positions, and

voluntary retirement.[4]  Second, the layoff scheme developed pursuant to the Plan tied termination to seniority <u>within job classifications</u>, rather than seniority across the board. Hypothetically, under this scheme, an NPP librarian with seven years of seniority could be laid off while a PDP office clerk with five years of seniority retained her position.  Vera's scheme thus eschewed the possibility of retraining veteran NPP employees to take over the jobs of less senior PDP members with jobs requiring a similar skill set (but bearing a different classification), thereby exacerbating the discriminatory impact of the layoffs. Third, the seniority system employed by defendants incorporated a fixed years-of-service threshold -- eight years and ten months -- that dated back precisely to the end of the previous PDP administration in Adjuntas.  In other words, any employee with eight years and ten months of seniority (or more) was immune from the layoffs.  Accordingly, PDP members hired during that previous administration were insulated from the layoffs, while all employees

---

[4]Article X of the Lay Off Plan provides:

> If the layoff is due to lack of funds, it must be evaluated if it is possible to generate savings through means other than requiring the elimination of permanent positions.  If the crisis is temporary, to consider reducing the work day and granting unpaid leaves.  To consider, additionally, if it is feasible to retrain employees in other functions or relocate them to other positions within or outside the Municipality.

Article X, <u>Layoff Plan for Municipality of Adjuntas Employees</u> (March 1997).

hired thereafter (during the intervening NPP administrations) were at risk of termination.

Finally, there was evidence that Vera contrived to shed NPP employees with sufficient seniority to withstand the initial round of layoffs by simply eliminating their job category altogether. For example, if an NPP member employed as a "Citizens' Affairs Specialist" outranked his PDP colleagues on the seniority scale, the municipality would eliminate the Citizens' Affairs Specialist position entirely, and then hire back the former PDP Citizens' Affairs Specialists under the auspices of Law 52 or some other employment program funded by outside sources.

## III.

As a preliminary matter, we note that our review of the legal issues in this case is handicapped considerably by the defendants' failure to produce transcripts of the second half of the trial. The defense began presenting its case on October 29, and the court issued its instructions to the jury on November 19. The only record of the defendants' case in chief before us is a small excerpt of Mayor Vera's direct testimony on October 30, and an excerpt of CPA Ramirez's direct testimony on November 6. The informative value of even these tidbits is reduced substantially by the defendants' failure to provide a transcript of the cross-examination of these witnesses by plaintiffs' counsel.

Rule 10 of the Federal Rules of Appellate Procedure clearly states that "[i]f the appellant intends to urge on appeal

-11-

that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to that finding or conclusion."  Fed. R. App. P. 10(b)(2).  Elaborating on this requirement, we have admonished appellants "with a regulatory bordering on the monotonous" that

> [t]his rule imposes a duty upon an appellant to print all of the evidence, good and bad, material to the point he wishes to raise. Should an appellant spurn this duty and drape an incomplete record around the court's neck, the court in its discretion either may scrutinize the merits of the case insofar as the record permits, or may dismiss the appeal if absence of a full transcript thwarts intelligent review.  In this vein, we have held . . . that, should the record provided on appeal preclude us from reaching a reasoned determination on the merits, it is the appellant who must bear the brunt of an insufficient record on appeal.

Moore v. Murphy, 47 F.3d 8, 10-11 (1st Cir. 1995) (internal citations and quotations omitted); see Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 963 (1st Cir. 1995); United States v. One Motor Yacht Named Mercury, 527 F.2d 1112, 1113 (1st Cir. 1975).

We are left with no choice but to confine our review of defendants' challenges to those claims adequately grounded in the portions of the record produced on appeal.  As we work our way through their manifold claims of error, we identify those challenges that we are unable to evaluate owing to the procedural default.

## A. Pre-Trial Rulings

### 1. Sufficiency of the evidence at the summary judgment stage

In partially denying defendants' motion for summary disposition of plaintiffs' political discrimination claims, the district court offered the following explanation for its ruling:

> Plaintiffs have put forth sufficient evidence to sustain their initial burden that Defendants' employment decisions were based on improper and discriminatory motives. Defendants have, however, put forth evidence in support of their burden that regardless of Plaintiffs' political affiliation, the municipal budgetary crisis required the municipality to cut jobs on the basis of seniority . . . . The Court finds that this proffer of evidence is sufficient to demonstrate that regardless of political affiliation, Defendants would have made the same decision in laying off Plaintiffs.

Acevedo I, 30 F. Supp. 2d at 154. Defendants contend that this finding mandated the dismissal of plaintiffs' political discrimination claims under the rule established in Mt. Healthy City Sch. Dis. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977), and insist that the district court erred in shifting the burden of proof back to plaintiffs to demonstrate that "they would not have been fired 'but for' their political affiliation." Acevedo I, 30 F. Supp. 2d at 154 (citing Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 39 (1st Cir. 1993); Aviles-Martinez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992)). The court compounded its error, in defendants' view, by postponing a final ruling on plaintiffs' political discrimination claims pending the submission of

additional evidence from plaintiffs to demonstrate that they were qualified to fill the seventy-seven new positions created by the municipality after January 1, 1997.  Defendants argue that the court was obliged to rule in their favor on the basis of the insufficient evidence currently before it.

These objections are unavailing.  When a district court's assessment of the evidentiary record at the summary judgment stage is subsequently "overtaken" by a full trial and verdict, it is our practice not to revisit that determination on appeal:

> We need not address the merits of [a] preverdict challenge to the sufficiency of the evidence on the motion for summary judgment. Such an attack on the denial of defendant's motion for summary judgment "has been overtaken by subsequent events, namely, a full-dress trial and an adverse jury verdict" . . . The rationale for this rule has been based on the procedural fact that denial of a motion for summary judgment "is merely a judge's determination that genuine issues of material fact exist.  It is not a judgment, and does not foreclose trial on issues on which summary judgment was sought."  Hence, a challenge to the sufficiency of the evidence adduced on the motion to support the district court's conclusion that genuine issues of material fact exist will not lie on appeal.

Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d 492, 500 (1st Cir. 1994) (internal citations omitted). Accordingly, any sufficiency of the evidence challenge on appeal must be grounded in the record as a whole.  Here, defendants also argue that the trial record considered in its entirety did not

support the jury verdict, and we address that claim later in the discussion.

2. <u>Severance</u>

On October 11, 1997, the district court severed the case into four separate trials, finding that

> it is not practical or just to subject one jury panel to a trial in which 82 plaintiffs with varying claims will be testifying. No single jury panel would be able to remember all of the testimony and evidence or be able to reach a fair and impartial verdict at the end of that time. It is the opinion of this Court that severance will most likely result in a just final disposition of this litigation.

The defendants objected on numerous grounds, arguing <u>inter</u> <u>alia</u> that the court's proposal (1) precluded defendants from eliciting contradictory testimony among plaintiffs, (2) imposed increased expense and inconvenience on defendants by compelling the examination of expert witnesses and government officials on four occasions rather than one, (3) reduced the likelihood of an impartial jury for the second, third and fourth plaintiff groups, and (4) hampered defendants' ability to portray the relevant events to the jury in a comprehensive fashion. On October 15, the court emphatically rejected these concerns in a written ruling:

> The considerations alleged by Defendants as to the fact that they would have to present evidence at four different occasions is of secondary importance. "A paramount consideration at all times in the administration of justice is a fair and impartial trial to all litigants.

Considerations of economy of time, money and convenience of witnesses must yield thereto."

Acevedo-Garcia v. Vera-Monroig, 240 F.R.D. 26, 30 (D.P.R. 2001) (quoting In re Bendectin Litigation, 857 F.2d 290, 308 (6th Cir. 1988)).

Defendants lodge two objections to the severance on appeal. First, they argue that the district court's refusal to try the claims of all eighty-two plaintiffs at once was inappropriate and unfairly prejudicial. We can dispense with this argument quickly. The decision to separate parties or claims is a case management determination "peculiarly within the discretion of the trial court," Gonzalez-Marin v. Equitable Life Assurance Socy., 845 F.2d 1140, 1145 (1st Cir. 1998), and courts of appeals accord broad latitude to district courts in this area. Id.; Applewhite v. Reichold Chems., Inc., 67 F.3d 571, 574 (5th Cir. 1995); New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1082 (2d Cir. 1988). We would note, however, that we need not rest our affirmance on this deferential standard of review -- the circumstances of this case compel the conclusion that the division of plaintiffs was a legitimate and feasible means of efficiently conducting this unwieldy litigation.

Defendants' second objection is more troublesome, and implicates the particular procedural device employed by the district court to quarter the proceedings. "Two types of severances or separations of claims are contemplated by the Federal

-16-

Rules of Civil Procedure -- one within the action itself, the other resulting in a second, or new action." Official Comm. of Unsecured Creditors v. Shapiro, 190 F.R.D. 352, 354 (E.D. Pa. 2000). Rule 21 of the Federal Rules of Civil Procedure furnishes the mechanism for separating a case into separate actions, i.e, severance: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately." Fed. R. Civ. P. 21; see 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2387 (1971); 88 C.J.S. Trial § 17 (2003) ("A severance occurs when a lawsuit is divided into two or more separate and independent or distinct causes."). Rule 42(b), on the other hand, authorizes courts to divide a single action into separate trials that remain under the umbrella of the original solitary action:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.

Fed. R. Civ. P. 42(b); see 9 Wright & Miller, Federal Practice and Procedure § 2387; 88 C.J.S. Trial § 17 ("An order for a separate trial keeps the lawsuit intact while enabling the court to hear and decide one or more issues without trying all of the controverted issues at the same hearing.").

-17-

The salient distinction between these two procedural devices concerns the appealability of an order terminating the proceedings in a partitioned piece of the litigation:

> The judgment in a severed action is final, enforceable and appealable when it disposes of all parties and issues. Conversely, the order entered at the conclusion of a separate trial is often interlocutory because a final and appealable judgment cannot be rendered until all of the controlling issues have been tried and decided.

88 C.J.S. Trial § 17; see White v. ABCO Eng'g Corp., 199 F.3d 140, 145 n.6 (3d Cir. 1999); 9 Wright & Miller, Federal Practice and Procedure § 2387 (1971) ("Separate trials usually will result in one judgment, but severed claims become entirely independent actions to be tried, and judgment entered thereon, independently.").

Courts often confuse these two procedural devices. "The procedure authorized by Rule 42(b) should be distinguished from severance under Rule 21 . . . . Unfortunately, this distinction, clear enough in theory, often is obscured in practice since at times the courts talk of 'separate trial' and 'severance' interchangeably." 9 Wright & Miller, Federal Practice and Procedure § 2387; see McDaniel v. Anheuser-Busch, Inc., 987 F.2d 298, 304 (5th Cir. 1993). Here, defendants argue that the court committed reversible error by invoking Rule 42(b) as the basis for partitioning the plaintiffs into four groups while conducting the proceedings as if they had been severed under Rule 21.

-18-

The district court addressed the distinction between Rule 42(b) and Rule 21 in its October 15 decision:

> In the instant motion, Defendants contend that severance of actions is covered by Rule 21 of the Federal Rules of Civil Procedure, and not by Rule 42(b). This distinction is of little consequence because both rules provide the Court with wide discretion to order severance . . . . The Court's determination as to whether it should sever the claims of Plaintiffs under Rule 21 or whether it should order separate trials under Rule 42 requires the same considerations, and are within the broad discretion of the District Court.

Acevedo-Garcia, 204 F.R.D. at 29-30. Although the court accurately observed that it had wide discretion to manage the litigation under either rule, the particular procedural device it employed is of paramount importance in this appeal. Because our jurisdiction is limited to "all final decisions of the district courts of the United States," United States v. Leichter, 160 F.3d 33, 35 (1st Cir. 1998) (emphasis added), we cannot exercise jurisdiction over an appeal from a separate trial ordained under Rule 42(b). See In re Licht & Semonoff, 796 F.2d 564, 569 (1st Cir. 1986) ("A 'final decision' is ordinarily one which disposes of all the rights of all the parties to an action.") (emphasis added). Moreover, since separate trials do not individually produce final judgments, any attempt to apply collateral estoppel to the remaining three trials would be invalid under a Rule 42(b) regime. See NLRB v. Donna-Lee Sportswear Co., 836 F.2d 31, 33-34 (1st Cir. 1987) (noting that one "essential element which must be present for the successful

application of issue preclusion" is that "the determination must result in a valid and final judgment.") (emphasis added); Griffin v. Burns, 570 F.2d 1065, 1072 (1st Cir. 1978) (same); Restatement (Second) of Judgements § 27 (same).

As defendants concede, this is not a case where the district court's intentions were ambiguous. See McDaniel, 987 F.2d at 304. The district court's order of October 11 explicitly states that "[e]ach Judgment entered at the end of each of these four trials shall be final and appealable and published and subject to all motions provided by the Federal Rules of Civil Procedure, such as 'new trial,' 'judgment notwithstanding the verdict', etc." Additionally, in its opinion rejecting defendants' objections to the severance, the court reasoned that

> conducting separate trials wherein the jury verdict from each trial is final and appealable as to each set of Plaintiffs facilitates judicial economy and possible settlement in this case by providing the parties with some scale or model upon which to re-assess whether further litigation would be prudent or advantageous to their cause.

Acevedo-Garcia, 204 F.R.D. at 30. Thus, the court's references to Rule 42(b) notwithstanding, its clearly articulated intent was to sever the plaintiffs pursuant to Rule 21. The Third Circuit observed in White that "[n]othing on the face of Rule 21 indicates that it must be explicitly invoked in order to have effect. There must be, however, a strong indication that the judge intended to effect a severance." White, 199 F.3d at 145 n.6 (citing Allied

-20-

<u>Elevator, Inc.</u> v. <u>E. Tex. State Bank of Buna</u>, 965 F.2d 34, 36 (5th Cir. 1992)). That intent is manifest from the language of the court's October 11 order. Accordingly, we find no reversible error in the court's severance ruling under Rule 21, and we regard the district court's entry of judgment on the verdict below as a final and appealable judgment under 28 U.S.C. § 1291.[5]

**B. The Trial**

1. <u>Evidentiary rulings</u>

Plaintiffs aptly characterize the defendants' challenges to the district court's evidentiary rulings as "rambling," "discursive" and "unrefined." Defendants' briefs narratively recite a plethora of offending rulings in a scattershot format devoid of legal authority, citations to analogous cases, or any application of law to facts. Many of defendants' challenges

---

[5]There is a potential argument, disavowed by defendants here, that Rule 21 (entitled "Misjoinder and Non-Joinder of Parties") is not applicable to cases where there has been no improper joinder of parties at the outset. However, the prevailing rule in our sister circuits is that a finding of misjoinder is not a prerequisite to severing parties or claims under Rule 21. As the Second Circuit observed in <u>Wyndham Assoc.</u> v. <u>Bintliff</u>, 398 F.2d 614 (2d Cir. 1968):

> Rule 21 . . . provides that "Any claim against a party may be severed and proceeded with separately." We believe that this provision authorizes the severance of any claim, even without a finding of improper joinder, where there are sufficient other reasons for ordering a severance.

<u>Id.</u> at 618; <u>see</u> <u>Safeco Ins. Co.</u> v. <u>City of White House</u>, 36 F.3d 540, 545-46 (6th Cir. 1994) (characterizing this principle as the majority rule).

reference evidentiary rulings and/or courtroom exchanges that occurred during their own case in chief, and hence are procedurally defaulted as a consequence of their failure to produce the relevant transcripts.  The briefs also leave uncertain which of the dozens of evidentiary challenges raised on appeal were properly preserved below.  See Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 14 (1st Cir. 1996).  With one exception, the evidentiary challenges that survive these procedural defects lack the developed argumentation needed to trigger review on the merits.  "We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 27 (1st Cir. 2003).

The one evidentiary challenge that does merit our attention is the defendants' contention that the court improperly admitted evidence about claims not at issue -- namely, political harassment claims filed by particular plaintiffs that the court had earlier dismissed.  Defendants correctly point out that, in some cases, evidence of previously dismissed claims may have an undue tendency to suggest a decision on an improper basis.  However, the Supreme Court has ruled that such evidence is not ipso facto inadmissible, noting that "[a] discriminatory act which is not made the basis for a [] charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."  United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977); see O'Rourke v. City of Providence, 235 F.3d 713, 726 (1st

-22-

Cir. 2001); Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 439 (1st Cir. 1997). We find no abuse of discretion in the district court's decision to admit this evidence as relevant background "to show the atmosphere in which [plaintiffs] lived and developed since Mayor Vera was elected Mayor."

2. Active participation of the court

Defendants allege that at various junctures during the trial the district court inaccurately and prejudicially commented on the evidence, truncated the defendants' cross-examination of several plaintiffs, and chastised defense witnesses in front of the jury. As we have previously observed, it is well settled that the trial judge "has a perfect right -- albeit a right that should be exercised with care -- to participate actively in the trial proper." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997). "A trial judge retains the common law power to question witnesses and to comment on the evidence . . . . An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice." United States v. Gonzalez-Soberal, 109 F.3d 64, 72 (1st Cir. 1997).

We reiterate that the complaints grounded in defendants' case in chief are defaulted on the basis of an inadequate record. Defendants also fail to demonstrate "serious prejudice" arising from the court's participation during plaintiffs' case in chief. This was a lengthy and contentious trial featuring dozens of witnesses, numerous sidebar conferences, and a myriad of other

-23-

procedural delays arising, _inter_ _alia_, from the inartful labeling and introduction of exhibits, translation difficulties, and a continuing stream of objections from both parties. Under these challenging circumstances, the court's efforts to accelerate the pace of the trial with infrequent commentary on the evidence and the occasional prodding of witnesses were amply justified and well within its discretion. _See_ _Rosario-Diaz_ v. _Gonzalez_, 140 F.3d 312, 315 (1st Cir. 1998) ("The Civil Rules endow judges with formidable case-management authority . . . . In exercising this power, trial judges enjoy great latitude.") (citations omitted).

**C. Post-Trial Rulings**

1. _Qualified Immunity_

The Supreme Court has recognized that qualified immunity embodies "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." _Mitchell_ v. _Forsyth_, 472 U.S. 511, 526 (1985). Defendants' efforts to invoke the protections of qualified immunity at the summary judgment stage, however, were rejected by the district court, which concluded that "[p]laintiffs [] proffered evidence of a triable issue of fact regarding a potentially discriminatory application of the Layoff Plan . . . . Therefore, Defendants are not entitled to qualified immunity for their allegedly discriminatory actions merely because they assert they acted pursuant to [the Layoff

-24-

Plan]." Acevedo I, 30 F. Supp. 2d at 149. As previously noted, we dismissed defendants' interlocutory appeal from this ruling, determining that we lacked jurisdiction to review the factual grounds for the district court's denial of qualified immunity. Acevedo II, 204 F.3d at 10.

After the jury returned its verdict, defendants renewed their challenge to the court's denial of qualified immunity,[6] arguing that in light of the facts elicited at trial, "the unlawfulness of implementing a layoff plan duly approved by the municipal legislature according to seniority would not have been apparent to a reasonable official." (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The court once again rejected defendants' claim, concluding that the jury's findings foreclosed the availability of immunity:

> For the record, the prohibition against political discrimination was clearly established in 1997 when Defendants acted to violate Plaintiffs' constitutionally protected rights. A jury trial was held wherein Plaintiffs presented evidence that supported their allegations of political discrimination. The evidence led the Jury to conclude that political affiliation was in fact a substantial or motivating factor for Mayor Vera Monroig's and Irma Gonzalez's actions . . . . Therefore, the qualified immunity argument that Defendants now make is simply an attempt

---

[6]Where defendants continue to assert qualified immunity after undergoing trial on a § 1983 claim, a post-trial grant of immunity would still confer a benefit by shielding them from any liability for monetary damages awarded by the jury. See Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58, 65 (1st Cir. 1997).

to re-write the facts and re-litigate this case.

Defendants allege two errors in the district court's post-verdict denial of qualified immunity. First, they claim that the court erred in failing to deliver two proposed instructions on qualified immunity to the jury:

1.        Proposed Jury Instruction 51: <u>Qualified Immunity</u>

> Government officials performing discretionary functions are granted qualified immunity from civil claims for damages, if their conduct at the time of the alleged acts that give rise to the civil damages "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The relevant inquiry "is the objective question whether a reasonable officer could have believed the actions alleged by the plaintiff herein" to be lawful, in light of clearly established law and the information the state official possessed.

2.        Proposed Jury Instruction 53:    <u>Reach of Qualified Immunity</u>

> Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable with respect to clearly established rights and laws at the time of the conduct at issue.

After proposing these instructions, defendants concede that they failed to object on the record to the court's refusal to issue the instructions before the jury retired to deliberate. Accordingly, we review for plain error only. <u>See</u> <u>Chestnut</u> v. <u>City of Lowell</u>, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) ("Failures to object, unless a true waiver is involved, are almost always subject to review for plain error."); Advisory Committee on the Federal Rules

of Civil Procedure, Report of the Civil Rules Advisory Committee 62-68 (March 14, 2001), revised Jul. 31, 2001 (modifying Rule 51 of the Federal Rules of Civil Procedure to provide for plain error review of challenges to jury instructions where the claim was not properly preserved).

The availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment. "When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty." Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002); see Singh v. Blue Cross/Blue Shield of Mass., 308 F.3d 25, 34 (1st Cir. 2002); Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997). Accordingly, there was no error, let alone plain error, in the district court's refusal to submit the proposed qualified immunity instructions to the jury.

Defendants also contend that the court committed reversible error when it failed to grant a new trial or judgment notwithstanding the verdict on the basis of qualified immunity. They reinforce this second claim of error with two legal arguments. First, they assert that the district court misapplied the second prong of the familiar three-pronged qualified immunity test:

> Determining whether qualified immunity is available to a particular defendant at a particular time requires a trifurcated

> inquiry. We ask, first, whether the plaintiff has alleged the violation of a constitutional right. If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation. Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right.

Hatch v. Dept. for Children, Youth and their Families, 274 F.3d 12, 20 (1st Cir. 2001). Defendants contend that the court erroneously characterized the "constitutional right" at issue as plaintiffs' right not to be discriminated against on the basis of their political beliefs during the implementation of the layoff plan. They decry the excessive abstractness of this "right," citing language from the Supreme Court's decision in Anderson v. Creighton, 483 U.S. 635 (1987):

> The operation of this standard depends substantially upon the level of generality at which the relevant "legal rule" is to be identified . . . . If [referring to the right to due process of law] the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging a violation of extremely abstract rights.

Id. at 639; see Rivera-Ramos v. Roman, 156 F.3d 276, 279-80 (1st Cir. 1998). It is difficult to divine from defendants' briefs how they would articulate the right at issue -- the pertinent discussion is geared exclusively to demonstrating the absence of

-28-

any clearly established rule regulating the implementation of seniority-based layoff plans. Of course, this approach commits the Anderson fallacy in reverse by construing the relevant rights/rules with such specificity that the predictably scant jurisprudence on point would never satisfy the "clearly established" threshold.

In the end, their argument is unavailing. The clearly established law both in this circuit and beyond precludes government officials from discharging civil or "career" employees for politically-motivated reasons. See Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976); Roldan-Plumey, 115 F.3d at 65-66; Jirau-Bernal v. Agrait, 37 F.3d 1, 3 (1st Cir. 1994). The complexity of the municipality's workforce reduction plan suggests that it was conceived by the Adjuntas municipal assembly as a politically neutral means of responding to the city's fiscal crisis. Yet the jury could reasonably have found that while the Plan itself was politically neutral, the method of implementation revealed the defendants' discriminatory intent.

Defendants also raise a challenge under the third prong of Hatch, relying on stipulated facts painting a bleak picture of the municipality's financial status, see supra, and the conclusory assertion that "the aforementioned set of circumstances clearly demonstrate that defendants acted within the reasonable boundaries of their duties under the lay-off plan." In limiting their focus to the objective circumstances surrounding the implementation of the Plan, defendants misconceive the salient inquiry under the

-29-

third prong of the qualified immunity analysis. As we observed in Tang v. State of Rhode Island, 120 F.3d 325 (1st Cir. 1997):

> The objective test focuses on the reasonableness of the official's conduct independent of motive. It is rarely going to be manifestly unreasonable, judged apart from motive, to [take certain action against] an employee. But because of special constitutional or statutory protections, some motives can convert [those decisions] into causes of action.

Id. at 327 (emphasis in original). Indeed, we recognized in Acevedo II that illicit motive is the touchstone of a political discrimination claim: "The plaintiffs allege that they were terminated because of their political affiliation, a constitutional claim that has no meaning absent the allegation of impermissible motivation." Acevedo II, 204 F.3d at 11; see Stella v. Kelley, 63 F.3d 71, 74-75 (1st Cir. 1995). Here, as plaintiffs point out, "the jury verdict necessarily rejected the claim that the seniority system was a politically neutral method for implementing the Layoff Plan."

Finally, defendants insist that the Supreme Court's decision in Saucier v. Katz, 533 U.S. 194 (2001), establishes "a margin for errors and expands the zone of protection in discretionary determinations where an official reasonably believed that he acted reasonably although [he] was later found to have acted unlawfully." The district court aptly disposed of this argument below by distinguishing Saucier on its facts:

-30-

> *Saucier* involved a military police officer's mistaken but reasonable belief that excessive force was needed to protect the Vice President of the United States from an unknown demonstrator. Because high security measures are needed to safeguard a United States Vice President, because the degree of danger posed by the demonstrator was unknown, and because law enforcement officers are usually required to make split-second, life and death decisions, the Court held that the officer acted reasonably . . . Mayor Vera Monroig and Irma Gonzalez acted over a 10-month period of time. As they had a long period within which to assess the situation, the probability that they could have made a "reasonable mistake" as in the case of an officer guarding the Vice President, is largely diminished.

Accordingly, we conclude that the district court did not err in denying defendants' post-verdict request for qualified immunity.

## 2. Sufficiency of the evidence

After the jury issued its verdict, defendants moved for judgment as a matter of law under Rule 50(b), or in the alternative for a new trial pursuant to Rule 59. The district court denied both avenues of relief, and defendants appealed. A party seeking recourse under either rule faces an uphill battle:

> In reviewing the denial of a motion for directed verdict or for judgment notwithstanding the verdict "we must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion -- that there is a total failure of evidence to prove plaintiff's case."

Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989) (quoting Mayo v. Schooner Capital Corp., 825 F.2d 566, 568 (1st

Cir. 1987)).  When considering a Rule 59(a) motion, "a district court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 717 (1st Cir. 1994).

Defendants' failure to produce the transcripts from their own case in chief precludes review of their sufficiency of the evidence challenges.  It is well-settled that a court must review a sufficiency of the evidence challenge against the backdrop of the record as a whole.  See United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir. 1992) ("In reviewing the record for a sufficiency of the evidence appeal, it is well established that the evidence must be examined in its entirety . . . "); N.Y. State Elec. & Gas Corp. v. Sec'y of Labor, 88 F.3d 98, 108 (2d Cir. 1996) ("[T]he sufficiency of the evidence is tested on appeal by viewing the entire record.").  As noted above, Rule 10 of the Federal Rules of Appellate Procedure requires an appellant contesting the sufficiency of the evidence on appeal to "include in the record a transcript of all evidence relevant to that finding or conclusion." Fed. R. App. P. 10(b)(2).  Our previous jurisprudence establishes that the evidence "relevant" to a finding of sufficiency (or lack thereof) is the record as a whole.  Since "it is the appellant who must bear the brunt of an insufficient record on appeal," Moore, 47 F.3d at 11, we must conclude that defendants have procedurally defaulted their sufficiency of the evidence challenges.

3. <u>Damages</u>

Rule 59(e) of the Federal Rules of Civil Procedure permits a party aggrieved by the jury verdict to move "to alter or amend the judgment" within ten days after entry of judgment. Fed. R. Civ. P. 59(e). Pursuant to Rule 59(e), the defendants filed a timely motion seeking reduction or remittitur of the damage award for each plaintiff. Where defendants properly preserve a challenge to the amount of compensatory damages awarded by the jury, "our inquiry is limited to determining 'whether the trial court abused its discretion in refusing to set aside the verdict as excessive.'" <u>Anthony</u> v. <u>G.M.D. Airline Servs., Inc.</u>, 17 F.3d 490, 493 (1st Cir. 1994) (quoting <u>McDonald</u> v. <u>Fed. Labs., Inc.</u>, 724 F.2d 243, 246 (1st Cir. 1984)). The review of a preserved challenge to a punitive damages award "is de novo, and the award will stand unless we find it 'certain' that the amount in question exceeds that necessary to punish and deter the alleged misconduct." <u>Romano</u> v. <u>U-Haul Int'l</u>, 233 F.3d 655, 672 (1st Cir. 2000).

These deferential standards of review implicitly recognize that "[t]ranslating legal damage into money damages -- especially in cases which involve few significant items of measurable economic loss -- is a matter peculiarly within the jury's ken." <u>Gutierrez-Rodriguez</u> v. <u>Cartagena</u>, 882 F.2d 553, 577 (1st Cir. 1989); <u>see</u> <u>Brown</u> v. <u>Freedman Baking Co.</u>, 810 F.2d 6, 11 (1st Cir. 1987) ("We rarely will override the jury's judgment on the appropriate amount of damages to be awarded."); <u>Segal</u> v.

-33-

<u>Gilbert Color Systems, Inc.</u>, 746 F.2d 78, 81 (1st Cir. 1984) ("This court has consistently declined to play Monday morning quarterback in reviewing a jury's assessment of damages."). Consequently, defendants bear the onerous burden of proving to our satisfaction that the damage award was "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." <u>Correa</u> v. <u>Hospital San Francisco</u>, 69 F.3d 1184, 1197 (1st Cir. 1995) (quoting <u>Segal</u>, 746 F.2d at 81).

The district court issued a strong endorsement of the jury verdict in rejecting defendants' Rule 59(e) motion below:

> The Court believes that the Jury considered all of the evidence presented, and fashioned their award in light of Plaintiffs' economic damages, and damages resulting from pain and suffering. Simply put, the verdict was not against the weight of the evidence. Considering the significant disruptions which Defendants' actions caused the Plaintiffs' lifestyles, the Court does not find that the compensatory and punitive damages award for each individual Plaintiff . . . is grossly excessive or inordinate. Further, after weighing the evidence, the Court finds that the damage award also does not shock the conscience.

<u>Acevedo-Garcia</u>, 213 F. Supp. 2d at 53. On appeal, defendants reiterate their objections to the jury verdict as excessive. They also raise a new argument that was not submitted to the district court -- namely, that the jury's award of compensatory damages for due process violations was duplicative of the political discrimination damages also awarded as part of the verdict.

-34-

a.  Duplicate damages

This argument, which is premised on an error of law, has more force than defendants' factually grounded claim of excessive damages.  Before addressing the consequences of defendants' failure to preserve this argument below, we examine the merits of the claim itself.

By way of background, the jury award was broken down into five components for the eight plaintiffs alleging discrimination, due process violations and harassment:

(1)  Due process violations;
(2)  Political discrimination in the form of harassment;
(3)  Political discrimination resulting in dismissal causing *pain and suffering*;
(4)  Political discrimination resulting in dismissal causing *loss of earnings*; and
(5)  Punitive damages

For the twelve plaintiffs alleging only political discrimination and due process injuries, the jury award contained all of the above components except (2).[7]

---

[7]The individual damage awards for each plaintiff are too lengthy to list here.  As a general matter, there was some uniformity among the damage awards.  For category (1), all twenty plaintiffs received $75,000 in compensatory damages from Defendant Vera and $75,000 from Defendant Gonzalez.  Every plaintiff also received $15,000 in punitive damages from Defendant Vera and $15,000 in punitive damages from Defendant Monroig.

Categories (2), (3), and (4) produced some variation.  For the eight plaintiffs alleging political harassment, the jury found that four had failed to prove political harassment, and awarded no damages in this category.  Two plaintiffs received $50,000, and the other two received $75,000.  Finally, the awards for pain and suffering ranged from $75,000 to $150,000, and the awards for lost earnings ran the gamut from zero damages awarded to $55,000 (all awards in this category reflected varying percentage reductions for

Defendants point out that plaintiffs' Fourteenth Amendment due process claims arise from the municipality's failure to offer the claimants alternatives to outright termination. The consequences of this denial of due process include the normal injuries associated with removal from a secure job -- lost earnings, pain and suffering associated with unemployment, lost future income, etc. Defendants contend that their alleged violation of defendants' First Amendment rights resulted in precisely the same harms. Because the jury essentially compensated plaintiffs for their unemployment injuries twice -- once under a First Amendment theory and once under a Fourteenth Amendment theory -- defendants argue that the court erred as a matter of law in entering judgment on a "double award" for the same injury.

It is well-settled that double awards for the same injury are impermissible. Lewis v. Kendrick, 944 F.2d 949, 954 (1st Cir. 1991); Freeman v. Package Mach. Co., 865 F.2d 1331, 1345 (1st Cir. 1988). Moreover, Congress intended for compensatory damages in section 1983 cases to remedy only actual injuries caused by a deprivation of constitutional rights, and not "the abstract 'value' of [] due process and First Amendment rights." Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 313 (1986). The Supreme Court elaborated in Stachura that

required mitigation of damages).

-36-

> when § 1983 plaintiffs seek damages for
> violations of constitutional rights, the level
> of damages is ordinarily determined according
> to principles derived from the common law of
> torts . . . . Congress adopted this common-law
> system of recovery when it established
> liability for "constitutional torts."
> Consequently, "the basic purpose" of § 1983
> damages is "to <u>compensate persons for injuries</u>
> that are caused by the deprivation of
> constitutional rights."

Id. at 306-07 (quoting Carey v. Piphus, 435 U.S. 247, 254 (1978)).

Consequently, any duplication problem cannot be resolved by

conceptualizing First Amendment and Fourteenth Amendment violations

as distinct "injuries" warranting separate compensation.

In defending the jury verdict, plaintiffs argue that the

damages awarded for the due process violations were retrospective

in nature, designed to compensate the claimants for wages lost from

the date of dismissal to the date of the verdict.  By contrast, the

compensatory damages awarded for defendants' Fourteenth Amendment

violations were forward-looking and intended to remedy the

plaintiffs' lost property rights[8] in their career employment

positions.  Specifically, plaintiffs argue that

> because career employment carries with it an
> expectancy of continued income prospectively
> (front pay), retirement and medical insurance

---

[8]Puerto Rico law grants career employees a property interest
in their government positions:  "Regular career employees are those
who have entered the system after undergoing the recruitment
procedure established in this subtitle, including the probational
period.  These employees shall be entitled to permanent status and
may only be removed from their positions for just cause after due
filing of charges."  21 P.R. Laws Ann. § 4554(b) (1991).

(lost benefits), and the security of continuing employment terminable only for cause, a deprivation of that right permits an additional award. This award is legally distinguishable in that it represents compensation for prospective losses, from the date of the trial forward, whereas political discrimination damages are calculated retroactively from the date of trial.

We agree with plaintiffs that both front and back pay are valid elements of a compensatory damage award under section 1983. Indeed, "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" Stachura, 477 U.S. at 307 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974)); see Davet v. Maccarone, 973 F.2d 22, 29 (1st Cir. 1992).

In support of their argument that the jury apportioned its compensatory damage awards between the First Amendment and Fourteenth Amendment violations, plaintiffs refer us to the "Political Discrimination" section of the special verdict form, which directs the jury to "indicate the amount of back pay to date [plaintiff] should receive" if political affiliation was a substantial or motivating factor in his/her dismissal (emphasis added). Yet there is no analogous reference to front pay in either the jury instructions or the due process section of the verdict form, which simply provides that "[u]nder the law you may choose to award damages for a violation of due process. If you answered

'YES' to the previous question [addressing liability], state the amount of damages this Plaintiff should be awarded from [defendants]" (emphasis added).

Moreover, plaintiffs' theory of apportionment arguably suffers from another flaw. If the jury had found defendants guilty of either a due process violation or a First Amendment violation, but not both, plaintiffs would still be entitled to front pay, back pay, and pain and suffering, because the singular violation would still have resulted in the loss of career employment and any secondary harms flowing from that loss. Put differently, nothing inherent in the nature of a due process violation limits the resulting economic injury to front pay, and nothing inherent in an act of political discrimination inflicts an injury that is limited to back pay.

Finally, we note that the court's duplicative damage instruction was worded so as to suggest that the relevant "injury" that could not be doubly compensated was the violation of a constitutional right, rather than an actual loss or harm.

> In awarding damages you should be careful not to award duplicate damages. Plaintiffs are entitled to collect full compensation for their injuries if proved, but they must not collect more than once for the same wrong . . . . Again, each plaintiff is entitled to collect full compensation for his or her injury but the plaintiff must not collect more than once for the same wrong.

(emphasis added).  The court's use of the term "wrong," read in conjunction with a special verdict form divided into separate sections for each constitutional violation, may have led the jury to conceptualize the term "injury" as the violation of a constitutional right <u>vel</u> <u>non</u>, rather than an actual loss <u>caused</u> by the violation of that right.  See <u>Stachura</u>, 477 U.S. at 306-07; <u>Carey</u>, 435 U.S. at 254.  Possibly, in the absence of more detailed instructions supporting plaintiffs' front pay/back pay theory, the jury may have erroneously awarded duplicative damages by compensating plaintiffs for the same actual losses under both a due process and political discrimination theory of liability.  We acknowledge, therefore, that the lack of clarity in the court's duplicative damages instruction was obvious error which may potentially have resulted in an improper award of double damages.

We must now decide whether defendants are entitled to relief in the face of this error.  Defendants were on notice throughout the proceedings that plaintiffs were seeking recovery for both due process violations and political discrimination.  To the extent that a jury award on both claims would be duplicative, the proper practice is to ensure that the verdict form is structured so as to allow the jury to recompense the plaintiffs' injuries just once.  As we observed in <u>Britton</u> v. <u>Murphy</u>, 196 F.3d 24, 32 (1st Cir. 1999):

> The problem of guarding against double
> recovery is a familiar one when multiple

-40-

claims exist but separate damages on each would be partly or wholly duplicative. If the parties explicitly agree that the damages should be the same on each claim, then it is easy enough to construct special interrogatories that identify separate bases for liability but have only a single line for damages. On the other hand, when the amounts awarded could conceivably differ depending on the claim but may also involve some overlap, verdict forms sometimes require a separate specification of damages for each claim on which the jury determines liability, leaving it to the judge to make the appropriate adjustments to avoid double recovery.

Id. (internal citation omitted). Defendants could also have requested jury instructions that clearly directed the jury to compensate the plaintiffs' unemployment injuries just once. Here, defendants failed to lodge a pertinent objection to either the jury instructions or the verdict form. Even after the jury delivered its sizeable verdict, defendants never submitted a post-trial motion challenging the actual award as duplicative. Accordingly, we review the appellants' allegation of duplicative damages for plain error only. See Chestnut, 305 F.3d at 20 (verdict form); M & I Heat Transfer Prods. v. Gorchev, 141 F.3d 21, 23 (1st Cir. 1998) (jury instructions); Advisory Committee on the Federal Rules of Civil Procedure, Report of the Civil Rules Advisory Committee 62-68; supra.

"We apply the plain error doctrine 'in exceptional cases or under peculiar circumstances to prevent a clear miscarriage of justice . . . [or] where the error seriously affected the fairness,

integrity or public reputation of judicial proceedings.'" Rocafort v. IBM Corp., 334 F.3d 115, 122 (1st Cir. 2003) (citing Beatty v. Michael Bus. Machs. Corp., 172 F.3d 117, 121 (1st Cir. 1999). Our previous cases reflect a marked reluctance to find plain error in civil cases: "[E]specially in a civil case this is a very hard test to meet because over and above plain error, it requires a showing both of prejudice and a miscarriage of justice or something of this magnitude." Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 62 (1st Cir. 2002) (citing Davis v. Rennie, 264 F.3d 86, 100-01 (1st Cir. 2001), cert. denied, 123 S.Ct. 118 (2002)).

Defendants' claim for relief from the alleged double damages founders on the prejudice prong of the plain error standard. In reaching this conclusion, we are in no way trivializing the consequences of this verdict for the municipality of Adjuntas and the individual defendants. The jury returned a verdict of $6,956,400, of which $6,356,400 (the total jury award, excluding punitive damages)[9] was against a municipality whose entire annual budget in 1996-97 was only $4,529,327. See Exhibit 2, Defendants' Statement of Uncontested Facts (July 17, 1998). Moreover, this figure reflects the damages owed only to the first twenty plaintiffs; sixty-two plaintiffs remain in the queue. But "prejudice," as that term is incorporated into the plain error test,

---

[9]In City of Newport v. Fact Concerts, Inc., 458 U.S. 247 (1981), the Supreme Court ruled that municipalities are immune from punitive damages under 42 U.S.C. § 1983. See id. at 271.

requires a strong causal link between the harm to the aggrieved party and the legal error. At best, defendants can only demonstrate the _possibility_ that faulty jury instructions resulted in a duplicative damage award.

Indeed, the appellate materials set forth competing explanations for the jury's award of damages under both a due process and First Amendment theory of liability. Appellants argue that the compensatory damages awarded under each theory doubly recompensed claimants for their actual losses, while appellees insist that the jury compensated plaintiffs for their total loss just once, but divided that single award between the due process and First Amendment causes of action. Nothing in this record precludes that possibility, or rules out other appropriate bases for the jury award. For defendants who fail to protect themselves on the record by requesting jury instructions and/or special verdict forms structured to preclude the possibility of a double damage award, these possibilities are fatal to a request for plain error relief. The "prejudice" component of the plain error standard implies a stringent demonstration of causation. Thus, in _Chestnut_ v. _City of Lowell_, our decision to vacate a punitive damage award on plain error review rested in part on the finding that "[p]rejudice in the sense of affecting the final outcome is . . . obvious: had the jury been instructed as to the City's immunity [from punitive damages] there _almost certainly_ would not be a $500,000 judgment against it

today, although conceivably the jury might have somewhat increased the compensatory damages." Chestnut, 305 F.3d at 20 (emphasis added). Here, although we can speculate that the court's instructions may have led the jury to erroneously award duplicative damages, we have no concrete basis for accepting defendants' characterization of the jury award. Under these circumstances, we decline to expand the rule of Chestnut to encompass cases in which prejudice to the aggrieved party is not manifest on the face of the record.

b. Excessive damages

Defendants meticulously document the economic damages awarded to each plaintiff, and argue mathematically that the totals in every case exceed the lost wages (reduced by the appropriate percentage for mitigation). As a threshold matter, the magnitude of the claimed discrepancy is sufficiently small (ranging from $2,607.94 to $10,900.00) to preclude a finding that the verdict was "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Correa, 69 F.3d at 1197; Segal, 746 F.2d at 81. Furthermore, the jury was entitled to consider any secondary economic injuries flowing from the plaintiffs' loss of earnings and employment benefits. See Stachura, 477 U.S. at 307; Davet, 973 F.2d at 29. For example, nearly every claimant testified that they relied entirely on their monthly earnings to cover the expenses of

running their household, meet their mortgage obligations, pay their childrens' tuition, etc. As a consequence of losing their jobs, plaintiffs were forced to seek additional bank loans, dip into their savings, and make other costly financial adjustments to cover these expenses.

We also decline to set aside the damages awarded in the other three categories (pain and suffering resulting from political harassment, pain and suffering resulting from dismissal, and punitive damages). Damages for pain and suffering defy "exact mathematical computation," Moore-McCormack Lines, Inc. v. Amirault, 202 F.2d 893, 898 (1st Cir. 1953); and "are not susceptible to proof by a dollar amount," Mejias-Quiros v. Maxxam Property Corp., 108 F.3d 425, 428 (1st Cir. 1997). The jury's awards of non-economic compensatory damages and punitive damages were moderate in scope and well within acceptable bounds. The individualized nature of the twenty verdicts reflects the jury's careful attention to the peculiar circumstances of each plaintiff, and evinces the jury's desire to craft an appropriate award for each claimant.[10]

---

[10]Plaintiffs argue on appeal that "[t]he due process award effectively was the monetary equivalent of reinstatement. Should that award be taken away or significantly reduced by this court, plaintiffs will not have been made whole for their due process injuries." Our decision to affirm that award moots plaintiffs' cross appeal from the district court's denial of reinstatement.

**D.  Non-Mutual Offensive Collateral Estoppel**

On January 30, 2002, the district court issued an order precluding the defendants from relitigating (with respect to the remaining sixty-two plaintiffs) the following three issues that were determinative of defendants' liability in the first trial:

(1)  That political affiliation was a substantial or motivating factor in the implementation of the lay-off plan.

(2)  That Defendants violated Plaintiffs' due process rights by implementing the lay-off plan in a discriminatory fashion.

(3)  That Plaintiffs were discharged from their career positions with the Municipality of Adjuntas on account of their political affiliation; and other individuals were employed to perform their duties under different titles, and under different programs, in violation of the law.

Acevedo-Garcia, 213 F. Supp. 2d at 40.  This ruling, if allowed to stand, would confine the scope of the subsequent three trials to the issue of damages.  Not surprisingly, defendants vigorously dispute the court's application of collateral estoppel, raising a host of objections that we consider in due course.

As a threshold matter, neither party disputes our jurisdiction to review the court's application of collateral estoppel.  This case presents unique circumstances, however, that call into question the ripeness of the collateral estoppel question. See Pustell v. Lynn Pub. Sch., 18 F.3d 50, 51 n.1 (1st Cir. 1994) (observing that we may raise issues of jurisdiction sua sponte). Generally, a court will determine that collateral estoppel is

appropriate within the very proceeding where the ruling is to have its preclusive effect. Here, the district court announced its attention to apply collateral estoppel at the end of Trial 1, but the court's ruling will have no preclusive effect until Trials 2, 3, and 4, which are not currently before us. Because these trials were severed into four independent proceedings pursuant to Rule 21, see supra, any resolution of the collateral estoppel question will have no effect on the rights of the parties as they pertain to Trial 1. See Cotter v. City of Boston, 323 F.3d 160, 173 (1st Cir. 2003) ("Article III's cases and controversies language prohibits federal courts from issuing advisory opinions. A court may not decide questions that cannot affect the rights of litigants in the case before it.") (internal quotation marks and citation omitted).

In the end, however, we conclude that we have jurisdiction to review the district court's application of collateral estoppel. The four cases comprising this matter began as a single lawsuit. The boundaries that now divide it into four severed cases are not temporal or transactional in nature. Instead, they are a judicial artifice imposed pursuant to the court's case management authority under Rule 21 to streamline the proceedings in the subsequent three trials. That the court chose to issue its collateral estoppel ruling at the at the end of Trial 1 rather than the beginning of Trial 2 in no way attenuates the finality of the order or the force of its preclusive effect.

-47-

Moreover, neither party disputes that the district court -- the same court that is presiding over the subsequent trials -- has entered a final order decreeing that non-mutual offensive collateral estoppel will be enforced in the subsequent three cases. The contours of the order are clear from its language, and the attorneys who litigated the issue below and now on appeal are the counsel of record for plaintiffs and defendants in all four matters. The district court's order bound the defendants as of its entry of January 30, and the application of collateral estoppel in the subsequent trials is a certainty beyond any speculation. Accordingly, there is no compelling reason for us to delay our review of the collateral estoppel question until the judgment in Trial 2 is appealed. If, as a consequence of sidestepping the collateral estoppel issue now, we belatedly reversed the district court's estoppel ruling at that late stage, we would unnecessarily void a burdensome litigation that is currently slated to involve twenty plaintiffs and forty-eight claims. Disclaiming jurisdiction over the district court's collateral estoppel ruling under these circumstances would vindicate form over substance, to the detriment of both parties and the district court. See Schneider v. Lockheed Aircraft Corp., 658 F.2d 835, (D.C. Cir. 1981) ("The potential future use of collateral estoppel in the remaining cases requires that we address these arguments in the interest of sound judicial administration.").

The brand of collateral estoppel applied by the district court -- non-mutual offensive collateral estoppel -- historically spawned the greatest misgivings among jurists. Prior to the Supreme Court's decision in Blonder-Tongue Labs. v. Univ. of Ill. Found., 402 U.S. 313 (1971), many courts adhered to the doctrine of "mutuality of estoppel," which ordained that "unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action may use the prior judgment as determinative of an issue in a second action." Id. at 320-21; see Triplett v. Lowell, 297 U.S. 638, 644 (1936); Restatement of Judgments § 93 (1942) ("[A] person who is not a party or privy to a party to an action in which a valid judgment . . . is rendered (a) cannot directly or collaterally attack the judgment, and (b) is not bound by or entitled to claim the benefits of an adjudication upon any matter decided in the action.").[11] The Blonder-Tongue Court determined that the traditional rationales

---

[11]In the case at bar, the application of collateral estoppel is "non-mutual" in the sense that the sixty-two plaintiffs benefitting from the pre-determination of liability were not parties in the trial of the first twenty plaintiffs, where the liability question was originally litigated.

undergirding the mutuality requirement[12] were unavailing in the face

of weightier institutional concerns:

> In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses -- productive or otherwise -- to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or "a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure."

Id. at 329 (quoting Kerotest Mfg. Co. v. C-O Two Co., 342 U.S. 180,

185 (1952)).  The excerpted language from Blonder-Tongue endorses

---

[12]According to Wright, Miller & Cooper:

The basic arguments against nonmutual preclusion may be seen from two aspects . . . . [T]he nonparty who seeks to invoke nonmutual preclusion has never had to bear the burdens of litigating the issues, and accordingly presents a much weaker claim than a party who has borne these burdens or a privy who has at least run the risk of defeat . . . . [T]he [second] argument is simply that the risk of proliferating the consequences of a mistaken judgment cannot be justified absent the full range of needs that require preclusion between parties and those in privity with them.

18A Federal Practice & Procedure § 4464 (2d ed. 2002).

the application of non-mutual <u>defensive</u> collateral estoppel. Collateral estoppel is "defensive" when wielded by a defendant to bar plaintiffs from relitigating an issue(s) previously decided in his favor in a suit involving other plaintiffs. For the reasons articulated by Justice White, permitting litigants to assert collateral estoppel in a defensive pose promotes efficiency by discouraging speculative lawsuits and conserving the resources of defendants.

Non-mutual collateral estoppel may be asserted offensively as well. That is, where, as here, plaintiffs seek to use issue preclusion to tie the defendants' hands with an adversely decided issue from a previous case, the use of collateral estoppel is deemed "offensive." As the Supreme Court recognized, the offensive use of non-mutual collateral raises special concerns:

> First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation,

-51-

> since potential plaintiffs will have everything
> to gain and nothing to lose by not intervening
> in the first action.
>
> A second argument against offensive use of
> collateral estoppel is that it may be unfair to
> a defendant. If a defendant in the first action
> is sued for small or nominal damages, he may
> have little incentive to defend vigorously,
> particularly if future suits are not
> foreseeable. Allowing offensive collateral
> estoppel may also be unfair to a defendant if
> the judgment relied upon as a basis for the
> estoppel is itself inconsistent with one or
> more previous judgments in favor of the
> defendant. Still another situation where it
> might be unfair to apply offensive estoppel is
> where the second action affords the defendant
> procedural opportunities unavailable in the
> first action that could readily cause a
> different result.

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31 (1979) (internal

citations and footnotes omitted). Notwithstanding these concerns,

the Supreme Court completed its break with traditional collateral

estoppel doctrine in Parklane Hosiery by according district courts

broad discretion to apply non-mutual offensive collateral estoppel:

> We have concluded that the preferable approach
> for dealing with these problems in the federal
> courts is not to preclude the use of offensive
> collateral estoppel, but to grant trial courts
> broad discretion to determine when it should be
> applied. The general rule should be that in
> cases where a plaintiff could easily have
> joined in the earlier action or where, either
> for the reasons discussed above or for other
> reasons, the application of offensive estoppel
> would be unfair to a defendant, a trial judge
> should not allow the use of offensive
> collateral estoppel.

Id. at 331.

Significantly, the Supreme Court's apprehensive regard for non-mutual offensive collateral estoppel is rooted in considerations that are inapposite in a unique case such as this where a court applies collateral estoppel to pieces of a severed action over which it is presiding. In the case at bar, the district court exercised its discretion under Rule 21 to mandate the severance of plaintiffs into four trial groups, thereby prohibiting the sixty-two plaintiffs in groups 2, 3 and 4 from voluntarily joining the first litigation. Once the action was severed, the prospect of multiple trials was eminently foreseeable to the defendants, if not explicitly assured. Moreover, with one eye on the impending three trials, and the other on their potentially immense exposure to the first group of twenty plaintiffs, see supra, the defendants had every possible incentive to vigorously litigate the issue of liability in the first action. See id. The contentious proceedings below, coupled with the copious materials filed by appellants in this appeal, confirm that defendants zealously contested (and continue to contest) the issue of liability to the first plaintiff group. Finally, because the court severed the proceedings on the eve of trial, defendants have fully availed themselves of discovery and other pre-trial procedures with respect to all eighty-two plaintiffs. Accordingly, there is little risk that the subsequent proceedings will "afford[] the defendant[s] procedural opportunities unavailable in the first action that could readily cause a different result." Id. The

district court's stated intent to preside over all four trials further suggests that trial and post-trial procedures for the remaining sixty-two plaintiffs will not vary substantially from the procedural opportunities available in the first trial.

Having addressed the background concerns raised by the application of non-mutual offensive collateral estoppel, we turn our attention to the most important question -- whether defendants "received a full and fair opportunity to litigate their claims" in the first trial. Parkland Hosiery, 439 U.S. at 332. Our prior jurisprudence enumerates four factors that we consider in this regard:

> (1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding),
>
> (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding),
>
> (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and
>
> (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order).

Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999); see Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994); NLRB v. Donna-Lee Sportswear Co., 836 F.2d 31, 34 (1st Cir. 1987).

Our focus here is confined to factor (2) -- actuality of litigation. To satisfy this factor, the party seeking to impose issue preclusion must demonstrate that the issue to be given

preclusive effect was actually litigated in the prior proceeding.[13]

Without excluding the possibility of other problems with the scope of the court's collateral estoppel order, we cite by way of illustration the political discrimination claims of plaintiffs. Those First Amendment claims implicate the burden-shifting framework set forth in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). To satisfy the first prong of the Mt. Healthy framework, plaintiffs must demonstrate that they engaged in constitutionally protected activities, and that this protected conduct was a substantial or motivating factor in an employer's adverse employment action. If plaintiffs satisfy the first prong, the second prong of Mt. Healthy shifts the burden to defendant to prove "by a preponderance of the evidence" that the plaintiff would have been subject to the adverse employment act even if he had not engaged in the protected conduct. Id. at 278; Lewis, 321 F.3d at 219.

---

[13]We reproduce the three issues once more for the reader's benefit:

(1) That political affiliation was a substantial or motivating factor in the implementation of the lay-off plan.

(2) That Defendants violated Plaintiffs' due process rights by implementing the lay-off plan in a discriminatory fashion.

(3) That Plaintiffs were discharged from their career positions with the Municipality of Adjuntas on account of their political affiliation; and other individuals were employed to perform their duties under different titles, and other different programs, in violation of the law.

The record indicates that eighty-two plaintiffs brought claims against the defendants, but the municipality only made seventy-seven new hires over the relevant period. Accordingly, it stands to reason that not every plaintiff was substituted for on a one-to-one basis. More fundamentally, application of the Mt. Healthy defense necessarily varies with the circumstances of the individual plaintiffs. Certain plaintiffs may have held municipal positions that were so superfluous or duplicative of the duties assigned to other employees that defendants could reasonably argue that these plaintiffs would have been terminated regardless of their political affiliation. Put differently, the defendants might be able to establish that the position of certain municipal employees were sufficiently precarious that they would have been eliminated under a properly motivated or improperly motivated implementation of the plan. This contention has never actually been litigated because it is necessarily unique to the circumstances of the particular plaintiffs involved in Trial 2. Yet the second clause of the third issue designates for preclusive effect the "established" fact that "other individuals were employed to perform their duties under different title, and other different programs, in violation of the law." In our view, this ruling runs afoul of the actual litigation requirement.

Our ruling is not intended to suggest that any flaws in the collateral estoppel order are limited to the second clause of

the third issue. Having identified this problem, however, we cannot go on to approve even in part a collateral estoppel order that purports to preclude any liability defense in Trial 2. Where even one issue of liability must be made available to defendants in the second trial, granting preclusive effect to the other issues may not result in efficiency gains because litigation of the "live" issue may require introduction of some of the same evidence pertinent to the estopped issues. See 18A Wright, Miller & Cooper § 4465.3 ("The need to relitigate individual issues that overlap the common issues may provide a special reason to deny preclusion -- little if any trial time will be spared . . .").

Still, for the reasons enumerated in the preceding background discussion, we acknowledge that non-mutual offensive collateral estoppel may well be a useful and appropriate trial management device in the second trial. Our ruling is not intended to discourage its application. However, any renewed consideration of that doctrine by the trial court must be grounded in the proceedings of Trial 2. Specifically, the judge and the parties should revisit the course of proceedings in Trial 1, and the issues and proposed proof in Trial 2. The defendants and the second plaintiff group should then have an opportunity to brief and argue the question of how the doctrine of non-mutual offensive collateral estoppel should be fairly applied in light of those considerations. At this juncture, and at this remove from an impending second trial,

we cannot determine with the necessary certitude that defendants have had a full and fair opportunity to litigate all the relevant dimensions of their liability defense. Accordingly, we must vacate the court's collateral estoppel order.

## IV.

The unique circumstances of this case presented the district court with a number of complex questions in areas that have previously received little attention in this circuit. The court correctly resolved most of these issues in comprehensive written decisions that greatly aided our review on appeal. The court also acquitted itself admirably in managing this difficult litigation. The errors we have cited in no way detract from our admiration for and appreciation of the court's work.

We **vacate** the district court's collateral estoppel order. In all other respects we **affirm**.

**So ordered.**